**CONSTAR, INC., et al., Plaintiffs,**

v.

**PLUMBERS LOCAL 447, Defendant.**

**No. CIV. S–81–807 LKK.**

United States District Court,
E.D. California.

Aug. 2, 1983.

Thierman, Simpson & Cook, Paul V. Simpson, Roger M. Mason, San Francisco, Cal., for plaintiff.

Victor A. Bertolani, Inc., Sacramento, Cal., for Plumbers Local 447.

OPINION

KARLTON, Chief Judge.

The developer of an office building and the general contractor on the project brought this suit against a local of the plumbers' union. The plaintiffs allege that the defendant's activities at the construction site constituted an illegal secondary boycott which damaged the plaintiffs. As I shall explain, the union cannot be held liable for those damages, for it did not act with the intent proscribed by the statute.

Ordinarily, judicial memoranda begin with a discussion of the facts, proceed to a review of the relevant law, and conclude with an application of law to facts which thus resolves the case. This opinion takes an unusual form, however; before discussing the specific facts of the dispute, I shall

attempt a fairly detailed explanation of the development of the pertinent law. I believe that only by describing both what the law has become, and what the parties misapprehend the law to be, can I make explicable the behavior of the parties—which would otherwise appear to be very strange indeed.

I

### FROM THE WAGNER ACT TO THE TAFT–HARTLEY ACT OR—WHAT HATH CONGRESS WROUGHT?

Since the advent of the industrial revolution, the struggle between capital and labor has been a central source of social disruption throughout the world. For about fifty years it has been this nation's policy to contain the effects of that struggle through a system by which industrial peace is achieved through negotiated settlement. See NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1936); 29 U.S.C. § 151 (1973). To permit meaningful negotiation, Congress adopted the National Labor Relations Act (NLRA) which protected both the organization of working people and their collective activity.[1] By the mid 1940's, however, capital and management had mounted an effective campaign asserting that labor unions had grown too powerful. In response to that argument, Congress, buffeted by the "strong contending forces and deeply held views on the role of organized labor in the free economic life of the nation and the appropriate balance to be struck between the uncontrolled power of management and labor to further their respective interests,"

Local 1976 United Brotherhood of Carpenters & Joiners of America v. National Labor Relations Board, 357 U.S. 93, 99–100, 78 S.Ct. 1011, 1016, 2 L.Ed.2d 1186 (1958), adopted the Labor Management Relations Act (LMRA).[2]

Among other things, the LMRA provides that certain activities of labor unions will be deemed unfair labor practices and, further, "whoever shall be injured in his business or property by reason or [sic] any violation" of those provisions "may sue therefor in any district court of the United States . . . and shall recover the damages by him sustained . . . ." 29 U.S.C. § 187(b).[3] As pertinent to the instant litigation, the statute provides that it is an unfair labor practice and thus unlawful for a union

[t]o engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or an industry affecting commerce, where in either case an object thereof is—

. . . . .

[f]orcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, . . .

1. The NLRA, as amended by subsequent labor legislation—including the LMRA, discussed in the text, infra—is currently codified at 29 U.S.C. § 151, et seq. Section 7 of the NLRA, as amended, provides as follows: "Employees shall have the right to self organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection and shall also have the right to refrain from any or all such activities except to the extent that such right may be affected by an agreement requiring membership in a labor or-

ganization as a condition of employment as authorized in § 157(a)(3) of this title." 29 U.S.C. § 157.

2. The LMRA, as amended, is currently codified at 29 U.S.C. § 141 (1947), et seq. The NLRA and LMRA, together with subsequent amendments, shall be collectively referred to as "the Labor Act."

3. Because this provision was incorporated into the Labor Act by § 303 of the LMRA, lawsuits arising under it have come to be called "303 suits."

29 U.S.C. § 158(b)(4)(i)(B).[4] Accordingly, if a union did engage in such prohibited conduct, a 303 suit would lie.

The language selected by Congress was most unfortunate. As the Supreme Court quickly recognized when it came to apply § 8(b)(4), "[t]his provision could not be literally construed; otherwise it would ban most strikes historically considered to be lawful, so-called primary activity." *Local 761, International Union of Electrical Workers v. NLRB (General Electric)*, 366 U.S. 667, 672, 81 S.Ct. 1285, 1288, 6 L.Ed.2d 592 (1961). Having been forced to take the first step down the slippery slope of ignoring the language of the statute, the courts and the National Labor Relations Board (NLRB) have spent the last thirty years elaborating a doctrine which—at least in the context of common situs construction cases such as this one—has the appearance not so much of law directed to the realities of the struggle of labor and management, but of a game of "NIGYSOB."[5]

As I shall endeavor to explain in the course of this opinion, both the representatives of labor and management in the instant case, on the advice of their respective counsel, thought they were playing a game of "gotcha." They were not, and the law did not require them to do so. In order to explain, however, both why the principals and their attorneys thought they were playing such a game, and why indeed they were not, some further explanation of the evolution of the law is necessary.

## II

## HOW WE GOT FROM THERE TO HERE, OR WHAT THE BOARD AND THE COURTS WROUGHT

A. *The Essential Nature of Secondary Boycotts.*

As noted above, the Supreme Court refused to apply the literal terms of § 8(b)(4).

Rather, it sought to determine what Congress must have meant by examining the statute's legislative history. The Court found that "the impact of the section was directed towards what is known as the secondary boycott whose 'sanctions bear, not upon the employer who alone is a party [to the labor] dispute, but upon some third party who has no concern in it.' [citation omitted]." *General Electric*, 366 U.S. at 672, 81 S.Ct. at 1289. Even so, the Court concluded:

> [N]ot all so-called secondary boycotts were outlawed in § 8(b)(4)(A). 'The section does not speak generally of secondary boycotts. It describes and condemns specific union conduct directed to specific objectives ... Employees must be induced; they must be induced to engage in a strike or concerted refusal; an object must be to force or require their employer or another person to cease doing business with a third person. Thus much that might argumentatively be found to fall within the broad and somewhat vague concept of secondary boycott is not in terms prohibited.'

*Id.* at 672–73, 81 S.Ct. at 1288–89. That is, since picketing (for instance) is not unlawful in itself, "[t]he key to determining whether section 158(b)(4)(i) and (ii)(B) was violated here is to identify the *object* of the union's picketing ...." *International Association of Ironworkers v. NLRB*, 598 F.2d 1154, 1156 (9th Cir.1979). In sum, then, the essentials may be readily articulated:

> It is settled that a union may picket a primary employer with which it has a labor dispute; indeed such picketing is expressly exempted from the prohibitions contained in § 8(b)(4). The union may not, however, picket a neutral employer in order to force that employer to cease doing business with the primary employer. Such picketing is "secondary" ...

---

**4.** Because this provision was amended into the Labor Act as part of § 8(b)(4), the violations of it are referred to as "8(b)(4)s."

**5.** "Now I've Got You, You SOB." *See* E. Berne, *Games People Play* 84–86 (1964). ("*Thesis.* This [game] can be seen in classic

form in poker games. White gets an unbeatable hand, such as four aces. At this point, if he is a NIGYSOB player, he is more interested in the fact that Black is at his mercy than he is in good poker or making money." *Id.* at 84).

*J.F. Hoff Electrical Co. v. NLRB,* 642 F.2d 1266, 1269 (D.C.Cir.1980).[6]

Thus the basic principle of law is simplicity itself: A union may picket a primary employer, and may do so even if it adversely affects the neutral employer and his employees unless that picketing "has as an object [ ] inducing those [neutral] employees to engage in concerted conduct against their employer in order to force him to refuse to deal with the struck employer." *General Electric,* 366 U.S. at 673, 81 S.Ct. at 1289. In essence, a trial of a "secondary boycott" 303 action, once picketing has been proved, is a trial of intent—that is, a determination of the object of the picketing.

B. *Moore Dry Dock: Inferring a Presumption Of Incoherence.*

The "object" of picketing is readily ascertainable where the primary employer and the neutral employer occupy different sites for their business activities. However, "this determination becomes much more difficult where, as here, the primary employer and the neutral employer perform separate work at a common situs." *Allied Concrete, Inc. v. NLRB,* 607 F.2d 827, 830 (9th Cir.1979). In response to the problem of determining whether such picketing has a prohibited or permitted purpose, the NLRB

> set out four standards for picketing in such situations which would be presumptive of valid primary activity: (1) that the picketing be limited to times when the situs of dispute was located on secondary premises, (2) that the primary employer be engaged in his normal business at the situs, (3) that the picketing take place reasonably close to the situs and (4) that the picketing clearly disclose that the dispute was only with the primary employer.

*General Electric,* 366 U.S. at 677, 81 S.Ct. at 1291, discussing *Sailors' Union of the Pacific (Moore Dry Dock),* 92 N.L.R.B. 547 (1950). The *Moore Dry Dock* standards have come

to dominate resolution of § 8(b)(4) cases. As I shall now explain, the impact of the NLRB's standards on 303 actions presents a somewhat difficult problem.

"When Congress created the National Labor Relations Board to administer [the NLRA], it expressed a judgment that the norms of labor relations could be better developed and applied by a specialized administrative agency than by the courts." R. Gorman, *Basic Text on Labor Law,* 291 (1976). With the passage of the LRMA, however, Congress also determined that a violation of section 8(b)(4) would give rise to an action for damages. "Congress was here concerned with reshaping labor-management legal relations ..." *International Longshoremen & Warehousemen's Union v. Juneau Spruce Corporation (Juneau),* 342 U.S. 237, 241–42, 72 S.Ct. 235, 238, 96 L.Ed. 275 (1951), and intended to provide two remedies—one directed to ending unfair labor practices, the other to providing for recovery of damages—which "were to be independent of each other." *Id.* at 244, 72 S.Ct. at 239. The Board of course retained its obligation to police unfair labor practices, and the Board's orders in this regard continued to be enforceable through the federal courts under section 101 of the Act. (*see* 29 U.S.C. § 160(*l*)). Under conventional administrative law doctrine, moreover, in the enforcement context courts were obligated to and did give substantial deference to the labor board's interpretation of the statute; surprisingly, however, the courts even deferred to the NLRB's evidentiary standards such as those set out in *Moore Dry Dock. See General Electric,* 366 U.S. at 677–81, 81 S.Ct. at 1291–93. Yet more surprising has been the wholesale incorporation of those standards into certain of the 303 cases relating to liability for tortious conduct. *See, e.g., Sherman Oaks Medical Arts Center v. Carpenters' Local Union,* 680 F.2d 594 (9th Cir.1982); *Gulf Coast Building & Supply Company v. International Brotherhood of Electrical Workers,* 428 F.2d

---

**6.** A "primary" employer is an employer directly involved in a labor dispute, while a "neutral" employer is one who is "a 'stranger' to that dispute ... 'uninvolved' with the union's grievance against the primary employer." R. Gorman, *Basic Text on Labor Law* 240–41 (1976).

121 (5th Cir.1970), *cert. denied,* 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed.2d 246 (1970).[7]

While it is clear that the courts have adopted the *Moore Dry Dock* standards, both in the enforcement context and in 303 suits, the application of the standards in specific cases has been effected with a stunning lack of clarity. That is to say, the courts have discussed the actual legal significance of these rules in a confusing and often inconsistent manner. I will now attempt to follow the interpretative thread through a crazy quilt of dicta regarding *Moore Dry Dock* in order to ascertain whether and how to apply those rules to the case before me.

I begin with the most fundamental observation to be made about the *Moore Dry Dock* rules: Taken together they are nothing more or less than a device to be used in evaluating evidence, developed to assist the trier of fact in determining whether or not specific union conduct (generally picketing) is valid, primary activity or has a prohibited secondary object. Despite the courts' repeated recognition of this principle, the courts have at times discussed the standards in language that seems to suggest that they are substantive rules of law rather than merely an integrated evidentiary device. *See, e.g., International Ass'n of Ironworkers, Local 433 v. NLRB,* 598 F.2d 1154, 1156 (9th Cir.1979) ("The guidelines that the Board established in . . . *Moore Dry Dock* . . . provide the proper test for determining the legality of union picketing at common situs construction projects."), cited with approval in *Allied Concrete Inc. v. NLRB,* 607 F.2d 827, 830 (9th Cir.1979). Whatever is meant by such dicta, it cannot properly be understood as accepting the *Moore Dry Dock* standards as substantive elements of an 8(b)(4) section 303 violation, for as the circuit courts have continually reaffirmed— even in the cases cited above—"it must be remembered that the *Moore Dry Dock* rule is only an evidentiary tool." *Allied Concrete, supra; quoting International Assn of Ironworkers, Local 433, supra; accord, Sherman Oaks Medical Arts Center v. Carpenters Local 1936,* 680 F.2d at 597; *see also Linbeck Construction Corp. v. NLRB,* 550 F.2d 311, 319 (5th Cir.1977); *NLRB v. No. Cal. Dist. Council of Hod Carriers,* 389 F.2d 721, 725 (9th Cir.1968).

Determining that the *Moore Dry Dock* approach is merely an evidentiary device is only one step, however, for that characterization does not in itself describe the nature of the device, or how it is to be utilized in this case. In the *General Electric* case, the Court taught that a union's adherence to the *Moore Dry Dock* standards would give rise to a presumption that the disputed picketing was entirely valid, primary activity. 366 U.S. at 677, 81 S.Ct. at 1291. Similarly, the Ninth Circuit has specifically held that if the four *Moore Dry Dock* criteria are met, a *presumption* is raised "that common situs picketing is directed against the primary and not a secondary employer." *Sherman Oaks Medical Arts Center,* 680

---

**7.** The courts' integration of *Moore Dry Dock* standards into 303 lawsuits is truly puzzling. While the courts are of course obligated to defer to administrative construction of the statute and its terms, the *Moore Dry Dock* standards address neither the statute nor its terms. On the contrary, as I discuss in the text, *infra,* they are merely a device for the evaluation of evidence. The notion of judicial deference to administrative construction is based upon the agency's expertise in the particular field, but the evaluation of evidence of tortious conduct is not a field in which administrative agencies are more expert than courts. As I have noted elsewhere, "deference is not the equivalent of subordination of judicial duty to executive decision." *Columbia Basin Land Protection Ass'n. v. Schlesinger,* 643 F.2d 585, 610 n. 3 (9th Cir.1981) (Karlton, J., dissenting). It is far from apparent why a district court, which is regularly called upon to evaluate such conduct and to determine the underlying intent, should give deference to an evidentiary standard adopted by an agency. This process is all the more puzzling when the court is not merely reviewing the agency's findings and orders, but rather is engaged in an independent determination of the facts for an entirely different purpose. Clearly application of the *Moore Dry Dock* standards may frequently make sense in specific factual settings. Nonetheless, the "complexity of the problem [and] the protean forms in which it appear[s]" *General Electric,* 366 U.S. at 676, 81 S.Ct. at 1291, suggests that there are also instances in which application of the standards is difficult at best, and of doubtful utility.

F.2d at 596. In the same case, however, the court of appeals also stated that "literal compliance with the standards set forth in *Moore Dry Dock* raises an *inference* that common situs picketing is primary in nature . . . ." *Id.* at 597 (emphasis added); *see also Allied Concrete,* 607 F.2d at 830, *quoting International Assn of Ironworkers, Local 433,* 598 F.2d at 1157.

Thus the exact function of the *Moore Dry Dock* standards is somewhat clouded. To begin with, a presumption is obviously not the same thing as an inference. " 'The word "presumption" properly used refers only to a device for allocating the production burden.' " *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254 n. 8, 101 S.Ct. 1089, 1094 n. 8, 67 L.Ed.2d 207 (1981), *quoting* F. James & G. Hazard, *Civil Procedure* § 7.9, p. 255 (2d ed. 1977); *accord, Hillery v. Pulley,* 563 F.Supp. 1228, 1249 n. 29 (E.D.Cal.1983). An inference, on the other hand, is a deduction of one fact from another proven fact by the ordinary rules of logic and reason. 1 J. Weinstein and J. Berger, *Weinstein's Evidence* ¶ 300[01] at 300-2 (1982). Where we deal with a factual finding, such as the object of picketing, "in the absence of persuasive [contrary] evidence [the inference] will suffice to prevail. Where we deal with a production burden, however, when [the adverse party] produces [any] evidence the presumption disappears and the court must weigh all the evidence adduced with the [party asserting the truth of the given factual issue ordinarily] bearing the burden of persuasion." *Hillery v. Pulley,* 563 F.Supp. at 1249 n. 29.

I must assume that the higher courts are well acquainted with the distinction between a presumption and an inference. Unfortunately, neither term, as it is usually defined, provides any real guidance to the court in this context; thus it is almost impossible to describe with certainty how the *Moore Dry Dock* tests are supposed to function. As suggested above, the basic function of a presumption is to allow the party bearing the burden of proof to introduce evidence of certain predicate facts, and by doing so, to "impose[ ] on the party against whom [the presumption] is directed the burden of going forward with evidence to rebut or meet the presumption." Fed.R. Evid. 301; *see generally,* E. Cleary, et al., *McCormick on Evidence,* 802–05 (2d ed. 1978). The union, however, does not bear the burden of production *or* persuasion, either in the context of an NLRB unfair labor practice hearing pursuant to section 8(b)(4), or in the context of a section 303 suit. *See NLRB v. Transportation Management Co.,* —— U.S. ——, —— – —— & n. 7, 103 S.Ct. 2469, 2473–75 & n. 7, 76 L.Ed.2d 667 (1983); *Pickens-Bond Construction v. Carpenters Local 690,* 586 F.2d 1234, 1239 (8th Cir.1978). Thus a union accused of conducting a secondary boycott enjoys absolutely no benefit from a "presumption" that its object was primary, since all that such a presumption could do would be to shift to the opposing party (i.e., the NLRB or the employer) a burden that that party already bore. Under the Federal Rules of Evidence, a presumption has no further significance; certainly it is not in itself evidence or something which can stand in lieu of evidence. *See* Fed.R.Evid. 301, notes of Committee on the Judiciary, Senate Report No. 93–1277, U.S.Code Cong. & Admin. News 1974, p. 7051, 7056 (" 'Presumptions are not evidence, but ways of dealing with evidence.' "), *adopted,* notes of Conference Committee, House Report No. 93–1597.

Similarly, it explains little to describe compliance with the *Moore Dry Dock* tests as "rais[ing] an inference that common situs picketing is primary in nature . . . ." *Sherman Oaks Medical Arts Center,* 680 F.2d at 597. It is true that the trier of fact may infer that a union, having carefully observed the four "rules," did not intend to enmesh secondary employers in the dispute. Even when the *Moore Dry Dock* tests have been satisfied, however, the courts are also required to look elsewhere to determine whether or not the union acted with the proscribed intent. *Id.* By the same token, a court may infer from other circumstantial evidence that the union did not act with the forbidden object in mind, even though one or more of the tests were not satisfied. *See*

*Helgesen v. International Assn of Iron-workers, Local 498*, 548 F.2d 175, 183 (7th Cir.1977).

These observations all flow from the fact that an inference is a device not of law but of logic. Unlike substantive rules of law, or legal devices (such as presumptions) an inference is by nature permissive rather than mandatory, *i.e.,* it is "a deduction which the trier [of fact] may or may not make, according to his own conclusions." *Black's Law Dictionary,* 917–18 (4th ed. 1968); *see also McCormick on Evidence, supra* at 803–04. Thus to describe compliance with *Moore Dry Dock* as raising an inference that the union had a primary object is to say no more than that the trier of fact may, if it sees fit, base a finding of lawful intent on the union's complying conduct, provided that there is no more persuasive evidence presented to the contrary. Such a modest principle hardly justifies the primacy which the courts and the NLRB have accorded the *Moore Dry Dock* standards in analyzing secondary boycott disputes; much less does it explain the lengths to which parties to such disputes have gone in order to shape their behavior around those standards.

Certainly the *Moore Dry Dock* tests do something more than point the trier of fact to certain kinds of conduct that may (or may not) be considered in determining the defendant's intent; it is not at all clear, however, what their greater significance is. Wigmore notes that before this century opened, Professor Thayer studied "the progress in various instances from the mere suggestion of such inferences to the creation of rules of law attached to them." 9 Wigmore, *Evidence* § 2491 at 304 n. 2 (Chadbourn rev. 1981). As I have explained, however, the *Moore Dry Dock* standards have not yet "progressed" to the point of representing a substantive rule of law, although certain otherwise inexplicable dicta suggest that they are indeed moving in that direction. Nor, as I have explained, does it make any sense to say that the Union has the benefit of a presumption created by compliance with the standards. There is simply no basis in the law for concluding that the Union bears either the burden of production or persuasion; again, a presumption shifts the burden of production, and the Union has no such burden to shift.[8]

There remain two relatively sensible explanations for the great significance with which the *Moore Dry Dock* standards have been treated. The first is the possibility that, in fact, *Moore Dry Dock* does represent a true presumption available to the party bearing the burden of production (i.e. the General Counsel in an NLRB proceeding, or the plaintiff in a 303 suit). Under this analysis, the complaining party would establish a prima facie case of illegal activity (which is to say, of conduct directed towards a secondary object) by showing that one or more of the four standards were breached.[9] The Supreme Court has noted

---

**8.** Needless to say, there is confusing dicta in this regard as well. It has been said that the Union has a "heavy burden ... to convince the trier of fact that the picketing was conducted in a manner least likely to encourage secondary effect." *Ramey Construction v. Local 544, Painters,* 472 F.2d 1127, 1131 (5th Cir.1973), *quoted in Allied Concrete,* 607 F.2d at 830 and *International Assn of Ironworkers, Local 433,* 598 F.2d at 1159. Whatever this mysterious language may mean, I do not believe that the plaintiff has been relieved of its burden of proving both the picketing and the unlawful object. Both elements are required under the statute to support a conclusion that the Labor Act has been violated. *See General Electric,* 366 U.S. at 672–73, 81 S.Ct. at 1288–89. As such, the plaintiff bears the burden of proof regarding each element. *Pickens Bond Construction v. Carpenters Local 690,* 586 F.2d 1234, 1239 (8th

Cir.1978); *see also Sherman Oaks Medical Arts Center,* 680 F.2d at 597. While I am reluctant to ignore language of a court by which this court is bound—even when, as in this instance, the language is clearly dicta—I must await further enlightenment from the higher courts as to how that language is to be applied, if at all.

**9.** Even were the court to accept this analysis, it would obviously not affect the result reached in this opinion. Under the Thayerian view of presumptions, accepted by Congress when it adopted the Federal Rules of Evidence, a presumption "disappears" when the opposing party introduces competent evidence of the nonexistence of the presumed fact. *See* Fed.R. Evid. 301 and notes following; 1 J. Weinstein and M. Berger, *Weinstein's Evidence* at 301–11–301–12 (1982). Given that the Union in this

(somewhat ruefully) that some courts have interpreted *Moore Dry Dock* in that manner. *General Electric,* 366 U.S. at 677, 81 S.Ct. at 1291. Nonetheless, such an interpretation continues to be at odds with the holdings of both the Supreme Court and the Ninth Circuit, reviewed above, which discuss *Moore Dry Dock* exclusively in terms of a presumption or inference in favor of the *union,* created by compliance with the tests. In the absence of some clarification from the higher courts, I am loathe to so restructure the *Moore Dry Dock* holding.

That leaves only the suggestion that the tests, taken together, represent something akin to a "standardized inference," discussed by Dean McCormick's successors. *McCormick on Evidence, supra* 803–05 and n. 31. Under this view, the plaintiff could not be held to have established a prima facie case of liability if it showed nothing more than that the union had picketed in compliance with the four standards. To put it another way, the trier of fact is required by law to give judgment in favor of the Union if the only evidence presented by the plaintiff (or the general counsel, in an NLRB hearing) was that the Union had picketed in such a way as to comply precisely with *Moore Dry Dock,* for the complaining party could not have proven that the union harbored unlawful intent. While this approach appears to me to be analytically sound and consistent with the cases, it is scarcely more helpful than the "mere inference" explanation discussed above. Labor disputes in the real world (and as reported in the cases) are simply too complex to present many situations which neatly fit

the *Moore Dry Dock* pattern and in which the Union has done nothing else whatsoever to evidence its intent. There is virtually always some more and different evidence. In that regard, the instant case is a splendid example of reality failing to fit the *Moore Dry Dock* mold, regardless of how hard the parties attempted to cram it in.

In the end, then, the *Moore Dry Dock* rules appear to be of the most limited utility as "evidentiary tools" to assist the trier of fact in ascertaining intent. The court is still left with the common implements with which to accomplish its task; [10] as the Supreme Court pointed out in another context:

> No cosmic principles announce the existence of secondary conduct, condemn it as an evil, or delimit its boundaries. These tasks were first undertaken by judges, intermixing metaphysics with their notions of social and economic policy. And the common law of labor relations has created no concept more elusive than that of "secondary" conduct; it has drawn no lines more arbitrary, tenuous, and shifting than those separating "primary" from "secondary" activities.

*Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 386–87, 89 S.Ct. 1109, 1120, 22 L.Ed.2d 344 (1969). Although the *Moore Dry Dock* standards seem to promise to make the metaphysical inquiry more concrete, they really do not perform that function in any obvious manner.

While the legal significance of the *Moore Dry Dock* holding may be quite limited, its practical effect on the conduct of labor dis-

---

case came forward with competent evidence showing that its object in picketing was "primary" rather than "secondary," any presumption of illegality that might have arisen by virtue of *Moore Dry Dock* violations was dispelled in the course of the trial. Put another way, after trial on the merits, the question of whether the plaintiff has made out a prima facie case—through the use of a presumption or otherwise—becomes irrelevant. *United States Postal Service Bd. of Governors v. Aikens,* —— U.S. ——, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983).

**10.** As I have previously observed, ultimately "all factual determinations must be made [ ] by

bringing to bear the trier of facts' intellect on the evidence adduced at trial." *Hillery v. Pulley,* 563 F.Supp. 1228, (E.D.Cal.1983) at 1243 n. 19. While, as I note in the text, the determination in the secondary boycott context has been viewed as a difficult one regarding an "elusive" fact, so are many other determinations of intent which courts are routinely called upon to make. *See, e.g., Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 255 n. 8, 101 S.Ct. 1089, 1094 n. 8, 67 L.Ed.2d 207 (1981) (describing "the elusive factual questions of intentional discrimination").

putes and ensuing litigation has been dramatic. Specifically, because of the persistent application of the standard, and because of the peculiar problems which attend construction projects worked jointly by union and non-union contractors, an elaborate and arcane system of conduct has developed governing labor disputes in the construction setting. This "reserved gate" system has evolved not so much to ensure labor peace as to provide a means of "proving" 8(b)(4) violations.

### C. The Reserved Gate System and How It is Supposed to Work.

As the Supreme Court observed, "picketing which induces secondary employees to respect a picket line is not the equivalent of picketing which has an object of inducing those employees to engage in concerted conduct against their employer in order to force him to refuse to deal with the [struck] employer." General Electric, 366 U.S. at 673–74, 81 S.Ct. at 1289–90. It follows that where common situs problems are presented, resolution of both the factual issue at trial and the practical issue at the construction site frequently will be extraordinarily difficult. To resolve the practical problem (and in turn moderate the legal problem), the (neutral) general contractor may seek "to isolate a labor dispute and to minimize disruption of the entire work force in common situs situations, [by creating] special gates [which are] reserved for the subcontractor who is the object of picketing." J.F. Hoff Electric Co. v. NLRB, 642 F.2d at 1270. Thus the "reserved gate" is one "for the use of [the primary employers'] employees, suppliers and certain other subcontractors, and the 'neutral' ... gate ... [is] used by everyone else connected with the project." Id. at 1268. "Any gate used to deliver materials essential to the primary employer's normal operations is subject to lawful picketing," id. at 1269, while the neutral gate must ordinarily remain free of picketing, so long as it remains "unpolluted."

The legal significance of these rules derives in turn from one of the Moore Dry Dock tests. As the Fifth Circuit explained, "on construction sites occupied by two or more employers, Moore Dry Dock ... will be applied to allegedly secondary picketing so that picketing at the gate reserved for a neutral employer generally will contravene the third Moore guideline—that picketing be limited to places reasonably close to the location of the situs ...." Linbeck Construction v. NLRB, 550 F.2d 311, 316 (5th Cir.1977); accord, International Assn of Ironworkers, Local 433, 598 F.2d at 1156. Unfortunately, the reserve gate system has itself created additional legal as well as practical problems.

So long as the neutral and secondary gates are maintained by the employers and their workers, the union should restrict itself to picketing the primary employer's gate, for if it does not it can anticipate that the trier of fact may later infer that the intent of the picketing was to reach the neutral employers' employees and suppliers. Thus questions arise as to what is sufficient to maintain the "neutrality" of the gate. This is important, we are told, "because the breakdown of the reserve gate system [is to be] considered in determining the propriety of the picketing." International Association of Ironworkers, Local 433, 598 F.2d at 1157 (9th Cir.1979).

If the reserve gate system does break down, the question arises as to what the union may do in response. In general, it appears that where the union cannot know that the "primary" employees and the primary employer's suppliers will only utilize the reserved gate, it is free to picket wherever those proper objects of its measures can "reasonably" be believed to be found, including the "neutral gate." Helgesen v. International Assn of Ironworkers, Local 495, 548 F.2d 175, at 183 n. 8 (7th Cir.1977); see also Huber & Antilla Construction v. Carpenters Local 470, 659 F.2d 1013 (9th Cir.1981), cert. denied, 456 U.S. 977, 102 S.Ct. 2244, 72 L.Ed.2d 852 (1982). Similarly, because violations of the "reserved gate" system are examined under Moore Dry Dock standards, a variety of other highly peculiar rules have developed. Thus the neutral employer must, in some fashion,

give notice to the union of the existence of the reserved gate system. *International Assn of Ironworkers, Local 433,* 598 F.2d at 1158. Moreover, inasmuch as almost all construction sites require subcontractors' services only on an intermittent basis, where the primary employer's "absence from the site is only temporary, the Board has often construed him to be engaged in normal operations on the site." *Linbeck Construction,* 550 F.2d at 318–19. The opportunity these rules give for the employer to play "hide and seek" with the union has given rise to a further rule that the employer must provide the union with truthful information, or the employer may not rely on the reserved gate system. *Id.* Finally, even if the reserved gate system breaks down, the employer may require the union to once again restrict its activities to the reserved gate, by giving notice of its "reestablishment." *See Carpenters Local 470 (Meuller-Anderson Inc.),* 224 N.L.R.B. 315, 316 (1976).

It is the interplay of the *Moore Dry Dock* standards and the reified rules of the reserved gate system, which has resulted in management and labor engaging in the game of "gotcha." Each time the employer in any way violates the strictest of the technical rules of the reserved gate system the union feels free to picket the neutral gate and to continue to do so unless and until the employer notifies the union that the reserved gate has been "reestablished." On the other hand, each time the union violates any of the technical requirements of *Moore Dry Dock,* the employer demands that the NLRB seek an injunction to restrain the union's nefarious conduct. *See* 29 U.S.C. § 160(*l*) (Labor Act § 10(*l*)). Finally, if the employer brings an action under section 303, the parties try the lawsuit on the basis of whether or not anybody violated the technical requirements of *Moore Dry Dock,* and specifically the rules of the "reserved gate system." As the court will explain in its examination of the facts, such was the conduct of the parties in this action, and such was the trial held in response to that conduct.

I am satisfied that the parties and their attorneys are simply in error. Violation of

the "technical factors" of the reserved gate system "is not determinative." *International Assn of Ironworkers, Local 433,* 598 F.2d at 1157. A failure to strictly adhere to the most technical requirements of the reserved gate system by the employer will not give rise to a right to the union to picket where it chooses, *id.,* nor do "sporadic violations" by the union necessarily "reflect an impermissible object under 8(b)(4)." *Linbeck Construction,* 550 F.2d at 319. "Our focus must always be. on the *object* of the Union's activities." *International Assn. of Ironworkers, Local 433,* 598 F.2d at 1158 (original emphasis); *accord, Sherman Oaks Medical Arts Center,* 680 F.2d at 597. Of course, the activities of the employer must be examined to determine whether or not the union had a right to picket the neutral gate, and the activities of the union must be examined to determine whether or not we may infer the prohibited object. The essential question, however, is always whether or not the union's object was to force the neutral employer to cease doing business with the primary employer. The conduct of the parties is of central importance because we may infer the Union's object from its own conduct and its responses to the employers' acts, not because a technical violation allows tort recovery. *See Allied Concrete,* 607 F.2d at 830; *Pickens-Bond Construction,* 586 F.2d at 1241.

I can well understand why both management and labor, habituated to trying these questions before the NLRB, where the issue is enforcement, come to focus on technical violations. Apparently, a technical violation can (and perhaps should) readily give rise to an enforcement order. In a section 303 context, however, the inquiry should not be whether either side committed technical violations, but rather a careful examination of all the circumstances to determine whether the union has engaged in tortious conduct—a question which ultimately turns upon the reason for the conduct.

D. *Summary: The Function of the Trier of Fact In a Section 303 Lawsuit.*

Plaintiffs brought this action seeking to prove that an object of the Plumbers' Union

picketing was to force Constar (the general contractor) to cease doing business with Ponderosa Plumbing (the primary employer in this dispute). It is well established that the employer need not prove that the prohibited object was the sole reason for picketing. *NLRB v. Denver Bldg & Construction Trades Council,* 341 U.S. 675, 689, 71 S.Ct. 943, 951, 95 L.Ed. 1284 (1951); *Sherman Oaks Medical Arts Center,* 680 F.2d at 596. Nonetheless, "because section 303 condemns certain union conduct directed to a specific objective, its violation requires a combination of action and so-called 'secondary' intent." *Pickens Bond Construction,* 586 F.2d at 1239.

Both the question of whether the Union engaged in concerted activity, and its objective in doing so, are questions of fact. *Pickens Bond Construction,* 586 F.2d at 1240. As to both issues, "[t]he complaining party has the burden of proof." *Id.* at 1239.[11] While of course "intent is inferred from the nature of the acts performed," *id.* at 1241, "ultimately, the Court must look to the totality of the circumstances to determine whether the activity was lawful." *NLRB v. National Ass'n of Broadcasting Employees,* 631 F.2d 944, 951 (D.C.Cir.1980); *accord Lane Crane Service v. IBEW Local 177,* 704 F.2d 550, 553 (11th Cir.1983). It follows that the union's response to perceived employer conduct, even if later proved to be erroneous and thus in technical violation of the *Moore Dry Dock* criteria,

would not require a finding of liability under § 303. *See, e.g., J.F. Hoff Electrical Co. v. NLRB,* 642 F.2d at 1274.[12] On the other hand, it seems that a union cannot willfully blind itself to the obvious facts and thereby hope not to be found liable for damages it caused in violation of the Labor Act. With these general principles in mind I now turn to the resolution of the instant case.

## III

## FINDINGS AND RESOLUTION OF THE CASE—OR WHAT THE PARTIES WROUGHT

Plaintiff David Butler Company was the general developer of a project consisting of a seven story office building known as the "Park Plaza Project."[13] It retained plaintiff Constar, Inc. (primarily owned by David Butler) as the general contractor on the project. In that capacity, Constar contracted with both union and non-union subcontractors to perform various aspects of the construction required to complete the project. Specifically, Constar contracted with Ponderosa Plumbing, a non-union subcontractor, to do the necessary plumbing work. Ponderosa Plumbing commenced work on the Park Plaza Project in approximately June of 1981.

When Ponderosa Plumbing appeared on the job, members of the defendant Plumb-

---

**11.** Moreover, plaintiff would also bear the burden of proof regarding damages. In the instant action, the trial of liability and damages has been bifurcated.

**12.** "[A] rule which would require the Union to divine the legal complexities of the contractual relationship on a construction site, at the risk of committing an unfair labor practice, would be unfair and unrealistic." *J.F. Hoff Electric Co.,* 642 F.2d at 1274.

**13.** The statute provides a cause of action to "[w]hoever shall be injured in his business or property by reason of any violation of [section 8(b)(4)]." Once again, however, the courts have declined to give a literal meaning to the words of the statute, and in this context have set far more restrictive "standing" require-

ments than the statutory language, taken alone, would support. *See Fulton v. Plumbers & Steamfitters,* 695 F.2d 402 (9th Cir.1982), *petition for cert. filed,* 51 U.S.L.W. 3775 (U.S., March 25, 1983) (No. 82–1678) (holding that courts "should look to the standing principles ... developed under section 4 of the Clayton Act for guidance in interpreting section 303's standing requirements." *Id.* at 406. For a recent discussion of standing under the Clayton Act, see *Associated General Contractors v. California State Council of Carpenters,* —— U.S. ——, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)).

The issue of whether or not David Butler, Inc. (the landowner/developer) had standing to bring this action was not raised by the Union. In any event, the court's disposition of the merits of this action renders it unnecessary to consider this problem further.

ers' Union appeared as pickets.[14] Remarkably, both management and the Plumbers' Union acted with self-restraint, and the picketing in question in this suit was entirely peaceful. This lawsuit involves only three separate periods of picketing by the defendants: The first spanned October 8, 9, 12 and 13, 1981; the second occurred on December 2 and 3, 1981; the third and final period of picketing took place on December 10 and 11, 1981.

Constar responded to the picketing by attempting to establish a reserved gate system.[15] At all times relevant to this action, the Park Plaza Project was entirely surrounded by fences, except for the east side where an adjacent structure set the boundary line. Gate 1 was located at the corner of 13th and J streets. Gate 2 was located at various places along the alley which constituted the northern boundary of the project.[16] Around October 21 and continuing through December 17 or 18, a further access point (or points) to the project was opened along the fence between Gate 1 and the alley. This "gate," was opened by the Sacramento Municipal Utility District, which was also engaged in construction on the site, in order to provide a convenient entrance for its subcontractor, Willie Murphy.

The court finds that Constar instructed Ponderosa to use only Gate 1 and that these instructions were repeated on several occasions. The court finds that Ponderosa in general adhered to the instructions regarding which gate to use.

The work of plumbing subcontractors is intermittent. Thus in the beginning of the project the underground plumbing must be installed; after the building is up the rough plumbing must be constructed; finally, it is necessary to do the finish plumbing. In order to avoid picketing during the periods when Ponderosa would not be on the site, Constar attempted to keep the Union informed of the subcontractor's schedule. On or about August 7, 1981, Constar advised the defendant by telegram that Ponderosa Plumbing "will have no employees performing work or supplies delivered on any day prior to October 1, 1981. Your union is instructed to confine its picketing of Ponderosa Plumbing to this scheduled date. For your benefit your union will be notified if this date changes." (Defendant's Exhibit L). In response to that telegram the union withdrew its pickets.

Picketing recommenced upon Ponderosa's return to the site. On October 6, 1981, one Brian McEvilly was on picket duty. He observed a plumbing truck which he ultimately identified as belonging to Ponderosa Plumbing stop in front of Gate 2. The passenger got out of the truck and walked through Gate 2. The driver of the truck exited the truck and walked to and through Gate 1. Mr. McEvilly then observed the passenger exit through Gate 2, and reenter through Gate 2. The driver and passenger remained on the site approximately one half hour, and then exited together through Gate 1.

These observations gave rise to the first round of "gotcha." The picket conveyed the information to Harry Rotz, the Union's business manager. Mr. Rotz, determining that Gate 2 had been "polluted," proceeded to post pickets at both Gates 1 and 2. That picketing commenced on October 8, a Thursday. Various other union subcontractors were scheduled to work that day. When they arrived, the defendant's pickets were present and the union subs' employees

---

**14.** Because Constar also contracted with other non-union subcontractors, the project was picketed not only by the defendant in this case, but by the Carpenters' Union, the Ironworkers' Union, the Laborers' Union, and the Electricians' Union. The plaintiffs sued various other unions under section 303 as well, but those lawsuits were settled prior to the trial of the instant matter.

**15.** For the purposes of this Opinion the gate reserved for non-union subcontractors is denominated Gate 1, and the gate reserved for union subcontractors is denominated Gate 2.

**16.** The actual access to the project along the alley was moved at various times to accommodate the need of entrance and egress depending upon material being delivered and the like. The fact that Gate 2 was moved at various times is not significant to this lawsuit.

refused to cross the line. Ponderosa Plumbing was not scheduled to work on October 8, and there appears to be no evidence that supplies were due on that day. The Union, however, had no reason to know of those facts.

On October 9 the pickets again resumed their station on Gate 2. Again union subcontractors were scheduled to work but refused to cross the line. Ponderosa Plumbing was not scheduled to work on the project on October 9, although Elton Cook, one of its owners, was present. Once again, the Plumbers' Union had no way of knowing whether or not Ponderosa Plumbing was scheduled to be on the site that day. On October 9, Constar sent a telegram to the union's attorneys which read, in pertinent part:

> We categorically deny any gate pollution, nevertheless, the reserved gate system has been reestablished effective noon October 9, 1981. Gate 1 is reserved for the exclusive use of Ponderosa Plumbing . . . Gate 2 is reserved for the exclusive use of all others. Plumbers' Union Local 447 must confine its picketing to Gate 1, if there are any further allegations of gate pollution please contact this office immediately.

Upon receipt of the telegram, the union pickets were withdrawn from Gate 2.[17]

On December 1, 1981, Thomas McEvilly, Brian's brother, was on picket duty. On that date he observed a truck carrying cast iron pipe (such as is used by plumbers) loaded on a pipe rack (such as used by plumbing trucks) enter the site from the access point which had been opened along 13th street for the use of the SMUD subcontractor. On December 2 the plumbers commenced picketing both Gates 1 and 2. Again, union subcontractors were scheduled and their employees refused to work. On December 3 the union again picketed at both gates, and union subcontractor employees refused to cross the picket line.

On December 3 the attorneys for Constar sent a telegram to the Union advising that the picketing was illegal because "the reserve gates have not been polluted to our knowledge, however, we have again advised Ponderosa Plumbing to use Gate 1 exclusively. Please confine your picketing to Gate 1." (Plaintiff's Exhibit 21). Gotcha! Mr. Rotz, treating Plaintiff's Exhibit 21 as a notice that the reserved system had been "reestablished," promptly pulled his pickets from Gate 2, and confined his picketing to Gate 1.

On December 8 Mr. Rotz himself was present on the site. He saw Mr. Elton Hook (a partner of Ponderosa) enter through the access gate in order to open Gate 1 to permit a Ponderosa truck to enter the premises. Picketing of both gates commenced on December 10 and 11. On the same day that Mr. Rotz placed his pickets at both Gates 1 and 2, he sent the following telegram to the attorneys for Constar: "Be advised that gate pollution occurred December 9, 1981, at 9:40 a.m. Please advise." Although this language may be subject to many interpretations, it seems clear to this court that Mr. Rotz was asking the employer to please reestablish the gate so that the Union could confine its pickets to the reserved gate, and thus avoid any possible problems which would flow from the Union being "required" (by the "rules" of the game) to picket both gates because of the pollution.

Counsel for Constar, however, declined to provide the Union with an easy way out. Rather, they forwarded a telegram with the following contents:

> Be advised that your picketing on this date at 13th and J streets at locations other than Gate 1 is illegal. Confine your picketing to Gate 1. Your flagrant disregard of the law is appalling.

Gotcha # 3! As bizarre as it may appear, Mr. Rotz, in his desperate effort to comply with the law as he understood it, treated that telegram as a reestablishment of the

---

**17.** Because the telegram was forwarded to counsel for the union, rather than the union, and by virtue of the fact that Mr. Rotz was

duck hunting between October 9 and 11, the pickets were not withdrawn until October 13, the following Tuesday.

reserved gate, and upon receiving it withdrew the Union pickets.

Two other findings of fact are appropriate to aid in resolution of the case. First, Mr. Rotz had circumstantial evidence that "pollution" of the gate system had occurred at times other than those discussed above. Both of the McEvilly brothers and Mr. Rotz testified that at various times while they were on picket duty they saw non-union employees pass through the appropriate gate. Later they saw the same employees back on the site, although those employees had not passed them through the reserve gate. From this set of facts, the pickets inferred that the employees must have used some means of gaining access to the site other than the reserved gate. Nonetheless, because the union did not feel that these facts were sufficiently concrete to establish "pollution" and so justify expanded activities, the Union did not respond by picketing Gate 2.

Second, the purpose of the Plumbers' Union activity was not to organize Ponderosa's employees. Those familiar with the great tradition of the American labor movement may find it hard to believe that the Plumbers were not engaged in the first business of any trade union—namely, to organize the unorganized. Nonetheless, the evidence in this case convinces me that they were not.

On June 17, Mr. Rotz wrote a letter to Ponderosa Plumbing informing the company that the Union was not interested in organizing Ponderosa's employees, and requesting simply that the company pay benefits and wages equivalent to those enjoyed by Union workers in the area. I do not base any finding merely on that letter, however. Rather, it is Mr. Rotz' explanation of his motivation which I find most persuasive in this regard. In essence, Mr. Rotz thought that Ponderosa Plumbing was too small an employer for the Union to be concerned with. What he was concerned about was ensuring that the many union contractors in the area remain union. The court finds that the entire purpose of the picketing of the Park Plaza Project was to make life sufficiently miserable for Ponderosa Plumbing—within legal boundaries, as the parties understood them—that no presently organized plumbing contractor would think it worthwhile to go non-union. The Union sought to do this by picketing Ponderosa, its employees and suppliers to the full extent permitted by law.

Of course, the fact that the primary dispute concerned area standards, rather than the right to represent Ponderosa's workers, does not bear directly on the question of whether the Union's immediate object was to pressure Constar. Such an unlawful secondary object can exist regardless of the nature of the primary dispute, for the essential inquiry when a secondary boycott is alleged is not the Union's ultimate goal, but rather the tactical objective of its activities. Under the circumstances of this case, however, an understanding of the Union's true purpose in its dispute with the primary employer helps illuminate its intention in picketing in the manner in which it did.

The Union was not particularly concerned with communicating with Ponderosa's employees. If that *had* been its aim it could have done its organizing work effectively while restricting itself closely to the non-union gate; any more expansive picketing could well be interpreted as nothing but an attempt to enmesh neutral employers. Rather, because the Union was most concerned with getting its message out to other plumbing contractors, it necessarily sought to broadcast the dispute as widely as it lawfully could. Given its goals, the Union had relatively little to gain and much to lose from attempting to coerce Constar, for even if it succeeded in forcing Constar to terminate Ponderosa from the project, it would have eliminated a relatively minor antagonist at the risk of tremendous liability exposure.

In short, an understanding of the Union's purpose in the primary dispute, coupled with the Union's bumbling but earnest attempts to comply with the law, strongly indicates that the Union was not endeavoring to apply pressure on Ponderosa by interfering with Constar's activities. The court finds as a fact that the purpose of the

picketing in question in the instant case was thus in no way related to the relationship between David Butler and/or Constar and Ponderosa Plumbing. The union neither desired nor intended to disrupt that relationship.

The court recognizes that at various times during the course of the picketing the union may well have technically violated *Moore Dry Dock* standards. Thus, the evidence appears clear that during the October picketing Ponderosa was not in fact on the project. Under the cases discussed in Section I, *supra,* this finding does no more than to deprive the Union of a "presumption" or "inference" of lawful conduct that would arise from strict compliance with the *Moore Dry Dock* tests. It in no way conclusively establishes unlawful conduct.

The circumstances, viewed in their totality, are far more useful than are these technical violations in resolving the question of the Union's object. I have already discussed the significance of the letter from Mr. Rotz to Ponderosa Plumbing, and Mr. Rotz' testimony regarding the nature of the dispute with Ponderosa and the purpose of the Union's picketing. As I have indicated, I find this evidence quite persuasive. Perhaps most persuasive—as the preceding discussion suggests—is the evidence of the Union's zealous effort to comply with what it understood the law to be. Despite the pickets' inference that Ponderosa's employees were using access points other than the reserved gate, the Union did not picket Gate 2, because it did not believe the evidence of pollution was sufficiently strong legally to justify such a response. Moreover, the Union withdrew its pickets following the December 10th and 11th picketing, even in the face of the refusal of Ponderosa Plumbing to play by what the Union understood to be the rules of the game. This is persuasive evidence of good faith. *See International Assn of Ironworkers, Local 433,* 598 F.2d at 1157.

Because the court believes that the evidence demonstrates the Union's good faith efforts to comply with the law, and that the picketing did not have an object prohibited by § 8(b)(4), it is unnecessary to resolve various other issues which the parties apparently think are important—at least as measured by the time spent in trial. Thus the court need not determine whether, on December 9, an employee of Ponderosa in fact walked through the neutral access gate, or whether the employee, after being called by his supervisor, backed through the neutral access point and walked out the reserved gate. Given the possible reading of the cases, the court can understand why counsel and their principals think that factual issue is important. Given the underlying legal principles (not to mention common sense), it simply is not.

The court is satisfied that there were instances of "gate pollution." The court is satisfied that there were instances in which the neutral "access point" was used by the primary's employees. The court is satisfied that at least insofar as Ponderosa was concerned, these isolated instances do not demonstrate a significant breakdown of the reserve gate system. As to the union, the court finds that, although there were occasional violations of the strict terms of *Moore Dry Dock,* those violations do not represent significant evidence that the Union had a prohibited purpose. Indeed, the court concludes that quite the contrary is true. Both the Union and management tried to obey the law, and for the most part they did so. The occasional failure of Ponderosa to strictly adhere to the reserve gate system on the one hand, and the Union's occasional failure to comply with *Moore Dry Dock* standards on the other, simply have no cognizable consequences under the circumstances of this case.

## CONCLUSION

By virtue of the above findings, and the court's understanding of the law, plaintiff has failed to carry its burden of proving that the union was engaged in a secondary boycott. Accordingly, judgment shall be entered for the union.

IT IS SO ORDERED.