**CONSTAR, INC., and David Butler Co.,**
**Plaintiffs-Appellants,**

v.

**PLUMBERS LOCAL 447,**
**Defendant-Appellee.**

No. 83–2316.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 16, 1984.

Decided Nov. 28, 1984.

Paul Simpson, Thierman, Simpson & Cook, San Francisco, Cal., for plaintiffs-appellants.

William A. Wright, Sacramento, Cal., for defendant-appellee.

Before DUNIWAY, SCHROEDER, and NORRIS, Circuit Judges.

DUNIWAY, Circuit Judge:

## I. FACTS.

This is an action for damages under § 303 of the National Labor Relations Act, as amended, 29 U.S.C. § 187(b). The plaintiffs are a building contractor and a developer; the defendant is a labor union. Judgment was for the union.

Constar, the general contractor for a building, contracted for the plumbing work with Ponderosa Plumbing, and Ponderosa had a dispute with defendant union. At the construction site, which was fenced, Constar designated one gate as "reserved" for Ponderosa. There, the union could and did picket whenever Ponderosa was doing work or having supplies delivered. The other gate was for the use of all others working on the building, and there the Union was not to picket. This arrangement has become common at construction sites. It was developed to accommodate the right of the union to picket the employer with whom the union has a dispute, the "primary" employer, while avoiding unlawful, "secondary," picketing of other employers on the job, with whom the union has no dispute. The latter activity is prohibited under § 8(b)(4) of the Labor Management Relations Act, 29 U.S.C. § 158(b)(4), because it can result in a boycott of the primary employer by the picketed secondary employer or a refusal to work by the secondary's employees.

Both Ponderosa and the Union complied with this system most of the time. On several occasions, however, Ponderosa used the neutral gate. In three controverted instances of this kind, and for a total of eight days, the Union responded by picketing the apparently "polluted" neutral gate, causing certain work stoppages, until Constar "reestablished" the gate as neutral, at which point the picketing stopped. We need not duplicate the district court's detailed description of these events. *See Constar, Inc. v. Plumbers Local 477*, E.D. Cal., 1983, 568 F.Supp. 1440, 1450–53.

Some of the judge's other findings are as follows:

The primary dispute began when Union agent Rotz wrote a letter to Ponderosa asking that Ponderosa pay union scale to its non-union employees. This was the ostensible object of the Union's picketing of Ponderosa; the Union was not trying to organize Ponderosa's employees. The actual purpose of the picketing was "to make life sufficiently miserable for Ponderosa Plumbing—within legal boundaries, as the parties understood them—that no presently organized plumbing contractor would think it worthwhile to go non-union. The Union sought to do this by picketing Ponderosa,

its employees and suppliers to the full extent permitted by law." 568 F.Supp. at 1453.

Constar and the Union were essentially playing a game, as each tried to assert its maximum advantage within the law: the Union by picketing the neutral gate whenever it became "polluted," until Constar complained and "reestablished" it, and Constar by threatening the Union with § 303 liability. In this game, each side made incidental errors. "At various times during the course of the picketing the union may well have technically violated *Moore Dry Dock* standards ... [but] those violations do not represent significant evidence that the Union had a prohibited purpose." *Id.* at 1454. As for Constar, "there were instances of 'gate pollution' ... in which the neutral 'access point' was used by the primary's employees ... [but] these isolated instances do not demonstrate a significant breakdown of the reserve gate system." *Ibid.*

The court concluded, "Both the Union and management tried to obey the law, and for the most part they did so. The occasional failure of Ponderosa to strictly adhere to the reserve gate system on the one hand, and the Union's occasional failure to comply with *Moore Dry Dock* standards on the other, simply have no cognizable consequences under the circumstances of this case." *Ibid.*

## II. THE LAW.

The reserve gate system at construction sites is an attempt to make concrete the application of the standards devised by the National Labor Relations Board in *Sailors' Union of the Pacific (Moore Dry Dock)*, 1950, 92 NLRB 547, 549. *See Electrical Workers v. Labor Board*, 1961, 366 U.S. 667, 677, 680–81, 81 S.Ct. 1285, 1293, 6 L.Ed.2d 592. The reserve gate arrangement, and its manner of use, are, as we have said, not substantive rules of law, but evidentiary. Conformity with the arrangement, or lack of it, are "evidentiary tool[s]," not per se compliance or noncompliance with the law. *Allied Concrete, Inc.*

*v. N.L.R.B.*, 9 Cir., 1979, 607 F.2d 827, 830. *See also Sherman Oaks Medical Arts Center v. Carpenters Local 1936*, 9 Cir., 1982, 680 F.2d 594, 596.

Literal compliance (or failure to comply) with the *Moore Dry Dock* standards does not preclude (or establish) a § 8(b)(4) violation or associated § 303 liability if the district court determines that the totality of the circumstances demonstrate impermissible secondary intent (or lack of it). Constar, as the complaining party, had the burden of proving the Union's unlawful intent.

■ Constar makes three arguments on appeal. First, it argues that any picketing of a neutral gate automatically violates § 8(b)(4) under *Moore Dry Dock*, in the absence of legally significant gate pollution. But although noncompliance with the *Moore Dry Dock* rules may provide evidence of illegal secondary intent, the rules should not be "mechanically applied so that a violation of one of the standards [is] taken to be presumptive of illegal activity." *Electrical Workers*, 366 U.S. at 677, 81 S.Ct. at 1291; *see Sherman Oaks*, 680 F.2d at 597. Rather, the district court properly looked at all the evidence and the totality of the circumstances in determining whether the Union had an illegal intent.

■ Second, Constar argues that the district court improperly required it to meet a higher standard of proof of a § 8(b)(4) violation in a § 303 action. Constar refers to the court's discussion of use by certain other courts in § 303 suits of the NLRB's evidentiary standards in § 8(b)(4) enforcement proceedings. 568 F.Supp. at 1443, 1444 n. 7. But the district court did not apply a higher standard of proof. The district court did not err in requiring proof of secondary intent, rather than merely of violation of the *Moore Dry Dock* rules.

■ Third, Constar argues that the Union violated § 8(b)(4) by intentionally failing to minimize the secondary effects of its picketing. *See Electrical Workers*, 366 U.S. at 678, 81 S.Ct. at 1292 (citing *Retail Fruit & Vegetable Clerks*, 1956, 116 NLRB 856, *aff'd* 9 Cir., 1957, 249 F.2d 591, 598);

*Sherman Oaks*, 680 F.2d at 597, *Allied Concrete*, 607 F.2d at 830. Constar in effect asks us to decide de novo the factual question of intent. We may not set aside the district court's findings of fact, however, unless they are clearly erroneous. Fed.R.Civ.P. 52(a). They are not.

Affirmed.