SACRAMENTO VALLEY CHAPTER OF THE NATIONAL ELECTRICAL CONTRACTORS ASSOCIATION (NECA) on behalf of itself, its members and contractors who have signed Letters of Assent or Given Powers of Attorneys to NECA, and all those similarly situated, Plaintiffs,

v.

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS (IBEW)–INTERNATIONAL OFFICE (I–O), and Local 340 of the IBEW, Defendants.

Civ. No. S–81–480 LKK.

United States District Court, E.D. California.

June 3, 1986.

Mark R. Thierman, Thierman, Simpson & Cook, San Francisco, Cal., for plaintiffs.

Robert E. Jesinger, Wylie, Blunt, McBride & Jesinger, San Jose, Cal., for defendant IBEW Local 340.

Peter Nussbaum, Neyhart, Anderson, Nussbaum, Reilly & Freitas, San Francisco, Cal., for defendant International Broth. of Elec. Workers (IBEW).

## MEMORANDUM AND ORDER

KARLTON, Chief Judge.

This order amends this court's previous order of May 22, 1986, and certifies the case for interlocutory appeal.

For the second time, this court turns to the litigation engendered by the strike engaged in by members of Local 340, International Brotherhood of Electrical Workers ("IBEW") against the members of the Sacramento Valley Chapter of the National Electrical Contractors Association ("NECA"). In *Sacramento Valley Chapter, etc. v. International Brotherhood of Electrical Workers*, 632 F.Supp. 1403 (E.D. Cal.1986), I dismissed defendant Local 340's cross-complaint which alleged that plaintiffs and a rival union violated the Sherman Act on the basis that Local 340 did not enjoy "antitrust" standing. In this opinion I consider the parties' cross-motions for summary judgment relative to plaintiffs' allegations that the defendants violated § 303(b) of the Labor Management Relations Act ("LMRA"). 29 U.S.C. § 187(b).

Plaintiffs seek to impose liability on defendants for injury which they allege was in part sustained by the Union's desire to include clauses in their collective bargaining agreement ("CBA") condoning illegal secondary conduct purportedly in violation of § 8(e) of the NLRA, 29 U.S.C. § 158(e), and a work preservation clause allegedly in violation of §§ 8(b)(4)(A) and (B) of the NLRA, 29 U.S.C. § 158(b)(4)(A) and (B).[1] Plaintiffs seek partial summary judgment in the form of a determination that the

---

1. Plaintiffs seek summary judgment on the second and fourth causes of action, and Local 340 and IBEW seek summary judgment on the first, second, fourth, and fifth causes of action. Defendants concede that the third cause of action raises factual issues which may not be disposed of without trial. Defendants' Motion for Summary Judgment at 8–9. At hearing, plaintiffs conceded that defendants were entitled to summary judgment on the first cause of action. As to the fifth cause of action, which alleged that

defendants violated section 8(b)(4)(A) of the NLRA because an object of the strike was to force plaintiffs to join a new multi-employer association, I granted plaintiffs fifteen (15) days to inform the court if they intended to proceed with this cause of action. Plaintiffs thereafter submitted nothing. Accordingly, defendants' motion for summary judgment as to the first and fifth causes of action of plaintiffs' Third Amended Complaint may be GRANTED without further analysis.

clauses at issue are illegal. Plaintiffs assert that the causal relationship between the clauses and the damages claimed is a material issue of fact in dispute and thus do not seek complete summary judgment.

Defendants, on the other hand, although they dispute plaintiffs' contentions concerning the legality of the clauses, argue that I need not address their legality. They contend that the clauses were not the cause of the strike nor a cause for its prolongation, and thus their legal character is irrelevant to any injury defendants sustained by virtue of the strike. On this basis, defendants seek summary judgment on plaintiffs' second and fourth causes of action.

I first articulate the relevant standard, and then turn to an exploration of the doctrine of causation relative to a § 303 complaint.[2]

## I

### SUMMARY JUDGMENT STANDARDS UNDER FED.R.CIV.P. 56

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Poller v. C.B.S.*, 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962); *Jung v. FMC Corp.*, 755 F.2d 708, 710 (9th Cir.1985); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir. 1984).

Under summary judgment practice, the moving party bears the initial burden of establishing, through affidavits or otherwise, the absence of a genuine issue as to any material fact. *Adickes*, 398 U.S. at 157, 90 S.Ct. at 1608; *Zoslaw v. MCA Distributing Corp.*, 693 F.2d 870, 883 (9th Cir.1982), *cert. denied*, 460 U.S. 1085, 103 S.Ct. 1777, 76 L.Ed.2d 349 (1983). If the moving party meets its initial burden, the

burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, —— U.S. ——, ——, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986); *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968); *Ruffin v. County of Los Angeles*, 607 F.2d 1276, 1280 (9th Cir. 1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1600, 63 L.Ed.2d 786 (1980).

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, which support its contention that the dispute exists. Rule 56(e); *First National Bank of Arizona*, 391 U.S. at 289, 88 S.Ct. at 1592; *Strong v. France*, 474 F.2d 747, 749 (9th Cir.1973). The opposing party must demonstrate that the fact in contention is material, i.e., a fact which makes a difference in the litigation, *Harris v. Tomczak*, 94 F.R.D. 687, 690 (E.D.Cal.1982), and the dispute is genuine, *Matsushita*, —— U.S. at ——, 106 S.Ct. at 1355. In this endeavor, the opposing party need not establish the material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First National Bank of Arizona*, 391 U.S. at 290, 88 S.Ct. at 1593. Thus the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to determine whether there is a genuine need for trial.'" *Matsushita*, —— U.S. at ——, 106 S.Ct. at 1356, *citing* Fed.R.Civ.P. 56(e); *International Union of Bricklayers v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir.1985).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and

---

**2.** I turn first to the question of causation since if defendants are correct in their assertion that the clauses at issue did not "cause" the strike, I need not determine whether a strike to force acceptance of any of the three clauses may be a predicate for liability under the statute.

admissions on file, together with the affidavits, if any. Rule 56(c); *Poller*, 368 U.S. at 468, 82 S.Ct. at 488; *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir. 1982). All reasonable inferences which may be drawn from the facts placed before the court must be drawn in favor of the party opposing the motion. *Matsushita*, — U.S. at ——, 106 S.Ct. at 1355, *quoting United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); *Abramson v. University of Hawaii*, 594 F.2d 202, 208 (9th Cir.1979). Nevertheless, as I have previously explained, inferences are not drawn from the air, and it is the opposing parties' obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines*, 602 F.Supp. 1224, 1244–45 (E.D.Cal.1985). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita*, — U.S. at ——, 106 S.Ct. at 1356, *quoting Cities Service*, 391 U.S. at 289, 88 S.Ct. at 1592.

## II

### SECTION 303 CAUSATION

■ Section 303(b) of the LMRA provides in relevant part that "[w]hoever shall be injured in his business or property by reason or [sic] any violation of subsection (a) [29 U.S.C. § 158(b)(4) ] may sue ... and shall recover the damages by him sustained...." 29 U.S.C. § 187(b). This provision requires a causal nexus between the alleged unlawful activity—the union's unfair labor practice—and the injury suffered by plaintiff. *Frito-Lay, Inc. v. Local Union No. 137*, 623 F.2d 1354, 1363 (9th Cir.), *cert. denied*, 449 U.S. 1013, 101 S.Ct. 571, 66 L.Ed.2d 472 (1980); *Feather v. United Mine Workers of America*, 711 F.2d 530, 537 (3d Cir.1983).

■ The language of § 303 is drawn directly from the treble damage provision of the Clayton Act, *Mead v. Retail Clerks International Association*, 523 F.2d 1371, 1376 (9th Cir.1975), *citing Teamsters Union v. Morton*, 377 U.S. 252, 260 n. 16, 84 S.Ct. 1253, 1259 n. 16, 12 L.Ed.2d 280 (1964), and § 303 was enacted as an alternative to subjecting unions to antitrust liability for secondary activities. *Id., citing Connell Construction Co. v. Plumbers and Steamfitters Local 100*, 421 U.S. 616, 634 and n. 15, 95 S.Ct. 1830, 1840 and n. 15, 44 L.Ed.2d 418 (1975). In the antitrust context, the " 'by reason of' language is read as incorporating common law principles of causation [citations omitted] with such modifications as may be suggested by the statute as a whole, and by Congress' object and purpose." *Id.* The Ninth Circuit has taught that such a reading is appropriate in § 303 unfair labor practice cases. *Id.*

Problems of causation in a § 303 context may not, however, given the case law, simply be disposed of by reference to the causational analysis found in antitrust cases. As I explain below, § 303 causation tenders a variety of issues—some familiar to tort litigation, and others quite distinctive. As I further explain, subjecting problems which are unconventional to ordinary tort analysis is at best difficult, and in my opinion unnecessarily confusing.

### A. *Multiple Causes vs. Multiple Motivations*

In *Mead,* the Ninth Circuit addressed two distinct notions under the general rubric of "causation."[3] *Mead* involved a suit by an employer under § 303 to recover damages allegedly sustained as a result of a strike conducted by a union. The union made two contentions. They first argued that there was insufficient proof that the Meads' loss of profits resulted from the strike and picketing rather than from other factors including business conditions and adverse publicity. 523 F.2d at 1376. The Union's second

---

**3.** As I discuss, "causation" is one thing, "motivation" is quite another.

contention was that even if the Meads' business losses were attributable to the strike, plaintiffs had failed to establish that the strike resulted from the union's demand for an unlawful contract clause rather than a lawful contract clause. *Id.*

The *Mead* court began its analysis by determining that both contentions rested upon assertions that "lawful forces may have combined with an unlawful force to bring about the injury." *Id.* In my view, however, the court's analysis did not come to grips with the two quite distinct problems under consideration. The Union's first argument raised the problem of multiple causes of economic injury; the second raised the problem of multiple motivations for a single course of conduct resulting in injury. Thus, the analytical approach adopted by the *Mead* court confounds two distinct problems, causation and motivation.

■ The problem of causation in conventional tort litigation explores the issues associated with multiple actors, or at least multiple events in the physical universe, which concur in resultant injury. *See* W. Prosser, *Law of Torts* § 41, at 238–244 (4th ed. 1971). In the § 303 context, causation addresses such questions as whether plaintiff's damages were occasioned by the strike, business conditions, or bad publicity. The *Mead* court determined that the appropriate test for answering this question was drawn from the antitrust laws and was whether the union's conduct, i.e., the strike, " 'materially contributed' to the injury, [citations omitted], or was a 'substantial

factor' in bringing it about, [citations omitted], 'notwithstanding other factors contributed also.' [Citations omitted]." 523 F.2d at 1376.[4]

■ The *Mead* court was also confronted with the question of multiple motivations for the strike. Because such activity is wholly protected unless engaged in for a prohibited motive, *Constar, Inc. v. Plumbers Local 447*, 568 F.Supp. 1440, 1442–43 (E.D.Cal.1983), *aff'd*, 748 F.2d 520 (9th Cir. 1984), the plaintiff must demonstrate that the otherwise protected activity is subject to suit because of the union's motive. *Id.* Frequently, however, the union will not have a single motive, but rather the strike will have occurred for a variety of reasons. Clearly this is a question distinct from plaintiff's having sustained damages occasioned by a variety of causes, one of which is the strike. In this aspect of the problem there is no question of causation, it is acknowledged that the injury was caused by the strike. Rather, the question is what were the union's motives for going on strike? Where a strike is the product of mixed motives, i.e., reasons which are protected under, as well as reasons which are prohibited by the law, the court is tendered the question of the effect of such mixed motives in establishing liability for the injury resulting from the strike. This latter question tenders an entirely different question than the conventional causation question, and because different considerations apply, might well require a different analysis.[5] As I explain, however, the circuit's

4. In *Mead,* plaintiffs offered evidence that, before the union's picketing began, their business was an established and profitable one, that the picketing interfered with deliveries to their store, that the expense in operating the store increased while business declined, and that the business became unprofitable. *Id.* at 1378. Based on this evidence, the court said that the trial court was entitled to " 'infer from this circumstantial evidence that the necessary causal relation between the [Union's] conduct and claimed damage existed.' " *Id., quoting Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 696–701, 82 S.Ct. 1404, 1409–11, 8 L.Ed.2d 777 (1962). Thus, there was sufficient evidence from which the district court could conclude that the union's strike and picketing

"materially contributed" to the Meads' losses. *Id.*

5. Motivation is ordinarily not an issue in conventional tort cases, thus the Restatement (Second) of Torts (1966) does not even have an index entry for "motive." Prosser, on the other hand, asserts that "[t]he motive or purpose underlying the defendant's conduct frequently plays a rather important part in the determination of tort liability." W. Prosser, *The Law of Torts*, § 5, p. 23 (4th ed., 1971). He also explains, however, that "[i]t is in the cases where motive is called into question that it becomes most clearly apparent that the law of torts is a battlefield of the conflict between *capital and labor*, between business competitors, and others

approach has left the appropriate mode of analysis in some doubt.

The circuit approached the problem of mixed motivation as if it raised typical questions of multiple causation. It first held that where it is possible to distinguish between injury occasioned by illegal motivation and injury occasioned by legal motivation, the Union can only be held liable for the former injury. *Mead* at 1378. In my view, this cautionary explanation is without a great deal of import. Except for questions of temporality, i.e., when a particular motivation was instrumental, severability of motivation for the purpose of determining liability is normally impossible. The efficient cause, or immediate agent, in the production of the injury is not the union's motivation, but the strike. That is, the motivation for the strike is never in that sense a cause of injury—the strike is always the cause. In that sense, as long as the illegal clause was on the bargaining table at all it is *a* motivation and thus a mixed motives case is tendered.[6] Mixed motive cases, in turn, tender a difficult set of policy problems inherent in, but not resolved by, the statutory formulation. On the one hand, Congress has declared as a national policy the right of employees to use concerted economic pressure to achieve certain aims; on the other, it has provided damages for employers injured by concerted economic pressure occasioned by illegal motives. The circuit believed that mixed motive cases, because the injury was occasioned by a single cause but motivated by illegal and legal aims, make it "impossible to wholly satisfy 'the dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own.'" *Mead* at 1379, *quoting NLRB v. Denver Building Trades Council*, 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951).[7]

In an effort to resolve the conundrum tendered by mixed motive cases, the Ninth Circuit in *Mead*, relying on antitrust cases, sought to incorporate into § 303 jurisprudence common law principles of causation "with such modifications as may be suggested by the statute as a whole, and by Congress' object and purpose." *Mead* at 1376. Here, as in the true causation cases, the court taught that "[t]he solution to both problems [multiple causes and multiple motivations] is found in a body of authority developed primarily under the antitrust laws." 523 F.2d at 1376. And, "[t]he rules of causation imported into the statutory scheme through the 'by reason of' language of section 303 afford a means of dealing with at least the extremes of the problem." *Id.* at 1379.[8] Thus the *Mead* court required "that the unlawful objective must have 'materially contributed' to the loss or have been a 'substantial factor' in

---

who have conflicting claims in the economic struggle." *Id.* at 26 (emphasis added).

**6.** As a matter of ordinary English usage, a motive is defined as an incitement to action. Motive is defined as "something within a person (as need, idea, organic state, or emotion) that incites him to action." Webster's Third New International Dictionary (1976). Thus by definition, if the illegal clause played any part in the decision to strike, it was a motive, and under the *Mead* characterization, a "cause." It thus follows that every strike is either motivated by wholly legal motives or is a mixed motives case in which an illegal reason was a "cause."

**7.** As I explain, the "impossibility" results from treating the problem as one of causation rather than motivation, see the discussion of *Mt. Healthy City Board of Education v. Doyle*, 429

U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), *infra*, or as one of apportionment of damages, *see* footnote 13.

**8.** The court's observation may be read as limiting its holding to the extremes of the problem and acknowledging that in closer cases, proximate causation analysis is inappropriate. If that was the court's intent, it is difficult to know precisely where *Mead* operates. Assuredly there are cases in which the union's motivations are either entirely legal or entirely illegal. For such cases, however, *Mead*'s multiple motivation analysis is unnecessary. *Mead* at 1378. For the reasons that I have explained above, however, in all other cases, the illegal motivation will always be an incitement and thus under *Mead*, "a cause." Accordingly, a strict application of traditional proximate causation analysis will almost always result in union liability.

bringing it about." *Id.*[9] Nonetheless, the court also noted in a footnote earlier in the opinion that the illegal motive must be the "moving cause," the "but for" cause or "the major or dominant cause," and thus the "proscribed motive must play a substantial role in the ... decision." *Mead,* 523 F.2d at 1377 n. 7. Finally, the court explained that illegal conduct was not a substantial factor where "[the lawful] objectives standing alone, would have caused the strike, but the unlawful objective, standing alone, would not." 523 F.2d at 1379. This standard was necessary, the Circuit explained, to deny "windfall recoveries by employers negligibly affected by a violation, and protect the union's right to strike for primary objectives where such objectives, standing alone, would have caused the strike." *Id.; see* footnote 6.[10]

For the reasons explained in footnotes 3–9, *Mead*'s formulation has not been without its difficulties, both practically and as a matter of theory. Thus the Third Circuit, purporting to adopt the *Mead* standard,

explained that the mere fact that the Union sought an illegal aim was insufficient to award damages unless that objective was a "substantial factor" in bringing about the strike. *Feather v. United Mine Workers,* 711 F.2d 530, 538 (3rd Cir.1983). On the other hand, another panel of the Ninth Circuit, and thus bound by *Mead,* has explained "general tort principles apply and therefore 'substantial cause' does not mean sole or predominate cause, but simply a materially contributing factor." *Rainbow Tours v. Hawaii Jr. Council,* 704 F.2d 1443, 1448 (9th Cir.1983), *citing Mead.*[11]

I have explained that resort to concepts developed under Restatement (Second) of Torts § 431 relative to "mixed motives" issues could be viewed as inappropriate because it deals with a different problem. If I were free to do so, I would draw on the only authority dealing with mixed motive cases that I am aware of, namely the Supreme Court's decisions in *Mt. Healthy City Bd. of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977),

**9.** Among other authorities cited by the *Mead* court was § 431 of the Restatement (Second) of Torts (1966). That citation illustrates the confusion inherent in the test employed in this Circuit. Section 431 deals with legal cause, and thus describes the rule applicable to the problems of multiple causation, i.e., multiple actors or events resulting in a single injury. The instant problem, however, concerns a single cause of injury—the strike—occasioned by multiple and mixed motives. The application of a doctrine dealing with multiple causes to a question of a single act motivated by multiple reasons is not easily accomplished. Because the injury is occasioned by a single cause, "the strike," once it is proved that an illegal motive was among the many reasons for the strike, that reason is always, at least to some degree, "a" cause. This resolution presents no problem for conventional torts, but is quite troublesome in the mixed motives context. Ordinarily, a determination that defendants' conduct was "a" cause suffices at common law since by virtue of the doctrine of joint and several liability, there is no need to allocate fault. Here, because of the need to protect the right to strike while at the same time providing damages for improper motive, allocation is an important issue.

**10.** This formulation taken literally is the incorporation of traditional proximate causation analysis into § 303 litigation. "Traditional" proximate cause is a formulation composed of a series of considerations including "causation in

fact" plus considerations of duty and social policy. Prosser at 244–45. Because duty and social policy are, in the federal system, questions for Congress, *see Sacramento Valley Chapter, etc. v. IBEW, supra,* the common law considerations culminating in a determination that a given event is or is not a "proximate" cause seem inappropriate considerations for the judicial system. Where, as here, Congress has developed goals which within a given factual and statutory framework are divergent, the judicial function is to serve both goals, not sacrifice one to the other. As I have explained above, however, traditional proximate cause analysis, because it frequently renders the union liable whenever a strike is occasioned by mixed motives, does not accomplish the job.

**11.** *Rainbow* dealt with the question of whether an employer's workers refused to cross a picket line because of sympathy for the strike or out of fear of union violence. That is, the question was not the Union's motives in striking (a mixed motives question), but the employees' reasons for honoring the picket line (a true question of causation). Like *Frito-Lay, Inc. v. Local Union No. 137,* 623 F.2d 1354 (9th Cir.), *cert. denied,* 449 U.S. 1013, 101 S.Ct. 571, 66 L.Ed.2d 472 (1980) which dealt with temporally distinct periods, see discussion *infra,* it is thus distinguishable from the instant problem.

and *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Those cases provide an understandable and a relatively straightforward means of solving mixed motive questions. Under those cases, a plaintiff proves prima facie liability, i.e., that defendant is "subject to liability," *see* Restatement (Second) of Torts § 5, by demonstrating an illegal motive. Thereafter, the burden shifts to defendant to prove that the lawful cause would have produced the injury in any event, i.e., that under the circumstances the conduct was "privileged." Restatement (Second) of Torts § 10.[12]

Resort to a *Mt. Healthy* analysis is not completely unwarranted. In footnote 7 of *Mead*, the court described unlawful discharge cases under § 8(a)(3) of the NLRA as "analogous" to the multiple motivations problem tendered in *Mead*. 523 F.2d at 1377 n. 7. Since *Mead* was decided in 1975, the U.S. Supreme Court has adopted the *Mt. Healthy* analysis in § 8(a)(3) discharge cases. *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 403, 103 S.Ct. 2469, 2475, 76 L.Ed.2d 667 (1983); *NLRB v. Daniel Construction Co.*, 731 F.2d 191, 197 (4th Cir.1984). Nonetheless, I do not believe I am free to apply *Mt. Healthy* for several reasons. First, the burden-shifting nature of the *Mt. Healthy* analysis was not Ninth Circuit law at the time *Mead* was decided. *Western Exterminator Co. v. NLRB*, 565 F.2d 1114, 1118 (9th Cir.1977) (where a party has two motives, one per-

missible and one impermissible, the better rule is that the improper motive must be shown to have been the dominant one). Moreover, and more to the point, as a district court, I cannot apply an appropriate test where the circuit's law requires a different one. *Mt. Healthy*'s teachings are simply incompatible with *Mead*'s application of the "substantial factor" test. Under *Mt. Healthy*, even if there were both legal and illegal motivations, the defendant could overcome its liability by showing that the legal motivation, in and of itself, would have caused the strike. Thus, a union could avoid liability under the *Mt. Healthy* test, even where both legal and illegal motives "caused" the strike. *Mead* appears to require that the union be protected in its right to strike where its legal objectives standing alone were sufficient to "cause" the strike *and* that the illegal objectives, standing alone, would not have caused the strike. 523 F.2d at 1379. Thus, *Mt. Healthy* is incompatible with *Mead* and I am not free to apply it.[13]

Under our system of binding precedent, I am obligated to apply the *Mead* formulation. Nonetheless, application of *Mead* is filled with problems. On the one hand, *Mead* articulates its test in terms of conventional proximate cause. Nonetheless, it also seeks to modify strict proximate cause standards by emphasizing that the reason must be dominant or, in any event, weighty. This latter qualification is neces-

**12.** "The word 'privileged' [means] that conduct, which under ordinary circumstances, would subject the actor to liability, under particular circumstances does not subject him to such liability. A privilege may be based upon ... (b) the fact that its exercise is necessary for the protection of some interest of the actor or the public which is of such importance as to justify the harm caused...." Restatement (Second) of Torts § 10.

**13.** Nor does proximate cause and the *Mt. Healthy* formulation exhaust the possibilities. One other way of solving the dilemma occurs to this court, and I am sure others exist. The "causational" nexus in mixed motives could be satisfied by plaintiff proving "causation in fact," Prosser at p. 237. Having done so, the trier of

fact would then be required to find the damages occasioned by the strike during the pertinent period and then allocate percentages of those damages to the motivations, legal and illegal, based upon the weight of a particular reason relative to all the reasons. Such a system of allocation would be similar to the solution developed by the California Supreme Court relative to allocation inter se of damages among jointly and severally liable tortfeasors. *American Motorcycle Ass'n v. Superior Court*, 20 Cal.3d 578, 146 Cal.Rptr. 182, 578 P.2d 899 (1978). Such a result would satisfy the objective of compensating injured plaintiffs without providing them with a "windfall." *Mead*, 523 F.2d at 1379. Given the binding authority of *Mead*, obviously I am no more free to fashion such a result than I am to apply *Mt. Healthy*.

sitated by the dual Congressional concern which it identifies.

■ The test articulated by the *Mead* court, perhaps most usefully denominated the *"Mead* materiality test," falls somewhere between the exculpating principles of *Mt. Healthy* and the inculpating principles of causation in fact. *Mead* teaches that the union is not liable if the illegal motivation is merely "an object" of the strike. *Mead* at 1379 n. 9. Thus, the union's activity must be more than just "a cause"—normally sufficient to establish causation in fact liability. On the other hand, a union cannot avoid liability by showing that the legal cause, in and of itself, would have "caused" its decision to go out on strike as it could under *Mt. Healthy*. The union must also show that the unlawful motivation, "standing alone, would not [have caused the strike]." *Mead* at 1379. Nonetheless, it seems relatively clear that *Mead* was struggling to incorporate a notion of the weight accorded the illegal motivations. Thus, it noted that the recovery is appropriate where "the unlawful motivation was a significant factor producing the union pressure." 523 F.2d at 1379. The court's effort to restrict tort liability to situations where the illegal cause was significant is further illustrated by its observation that "[e]ven when the employer is unable to establish that the unlawful secondary motive is a substantial cause of the coercive activity by the union, the employer is not remediless. Section 8(b)(4)(A) is violated if the secondary clause is 'an object' of a strike." [Citation omitted.] *Id.* at n. 9.

Although the Ninth Circuit has said of its *Mead* decision that the weight attributable to an illegal motive is not significant, and that liability will attach if an illegal

motive is "simply a materially contributing factor," *Rainbow Tours v. Hawaii Jr. Council,* 704 F.2d at 1448, as I pointed out above, the observation is, for true mixed motives cases merely dicta. *See* footnote 11. Moreover, the *Rainbow* observation is inconsistent with the reasoning underlying the *Mead* court's adoption of its causation standard. As noted above, the *Mead* court was concerned that plaintiffs not receive a windfall where the illegal motive was a negligible cause of the strike. *Mead* at 1379. For this reason, the *Mead* court required that the illegal motive must be a "substantial factor," and the "major or dominate cause." 523 F.2d at 1377 n. 7. All this would suggest not only that the illegal motive must simply be "a" cause, but also that it be a weighty consideration in either bringing the strike about, or prolonging it. With this understanding, I turn to a resolution of the causation issue on a clause-by-clause basis, and then consider the effect of the "package requirement."

For the reasons explained below, I find that the Union has made a prima facie showing that none of the clauses in issue was a weighty motive for either initiation of the strike or its prolongation, thus shifting the burden to plaintiff under summary judgment practice to show a "genuine" issue of material fact. Because I find that the plaintiffs have not produced evidence sufficient to require trial, the Union's motion for summary judgment will be granted.[14] To explain the significance of the sequence of events, however, I first consider the legal consequence of the fact that at various material times the clauses in issue were not in contention at all.

### B. *Temporality*

One other aspect of the problem generally falling under the rubric of causation

14. I concede that the court's decision has the appearance of an application of the *Mt. Healthy* test, but I assure the parties such is not the case. Rather, summary judgment is granted by virtue of the application of a "weighty" proximate cause standard, which taken in conjunction with the burden shifting standard of summary judgment practice, *see Matsushita, supra,* conjoins in the instant order. This result is necessitated by application of the *Mead* materiality test and the sequence of events under consideration.

which must be considered in the instant case is the issue of temporality. The Union claims that, at least for some periods of time, the clauses plaintiffs' complain of were not in contention at all; as to those times the Union argues, no liability can be imposed.

■ The Ninth Circuit has observed that a "strike cannot ... be viewed in isolation from the bargaining that surrounds it," and thus the possibility that a union may be held liable for damages even after illegal clauses have been "renounced" cannot be "foreclosed." *Frito-Lay, Inc. v. Local Union No. 137,* 623 F.2d 1354, 1363 (9th Cir.1980). It seems clear, however, that in the ordinary case, in order to preserve the union's right to strike, it can only be held liable for damages occasioned by strikes motivated by unlawful purposes. *United Mine Workers v. Gibbs,* 383 U.S. 715, 729, 86 S.Ct. 1130, 1140, 16 L.Ed.2d 218 (1966), *Teamsters Local Union 20 v. Morton,* 377 U.S. 252, 261–62, 84 S.Ct. 1253, 1259, 12 L.Ed.2d 280 (1964). Thus ordinarily, to the degree that the Union can prove that during any period the clauses at bar, even if illegal, were not in issue, no liability should be imposed.

### III

### FACTUAL BACKGROUND[15]

#### A. *General Background*

This action arose out of a strike by union electricians in the Sacramento area against the employer plaintiffs and others which lasted from June 11, 1981 to September 15, 1981. NECA, a multi-employer bargaining association, was a signatory to a collective bargaining agreement ("CBA") with Local 340 covering inside electrical construction. The parties had contracted for a number of years, the last contract extending from June 1, 1978, to May 31, 1981. Each of the ten plaintiff employers was represented by

NECA for collective bargaining purposes during 1981.

On February 27, 1981, and prior to the formal commencement of negotiations for a new CBA, opening letters were exchanged between the Union and NECA. Formal negotiations commenced on April 22 and proceeded through May until early June. On May 29, 1981, Lee Frith, Business Manager of Local 340, informed Kenneth Carlson, the Executive Manager of Sacramento Valley NECA, that the Union's membership would strike on June 11, 1981, if no agreement was reached by that date. Further negotiations were held, but no agreement was reached and the strike commenced against each of the plaintiff electrical contractors on June 11.

It is uncontested that throughout the strike the parties were unable to reach agreement over wage rates and various conditions of employment. As I explain below, in addition to those issues, the parties failed to agree about the clauses which plaintiffs contend were illegal. Further negotiations were held in June, July and August, but the parties failed to reach a new CBA, and on September 15, 1981, Local 340 disclaimed any further interest in representing the employees of all employers represented by NECA.

#### B. *NECA's NLRB Claims*

On or about July 10, 1981, NECA filed an unfair labor practice charge with the NLRB alleging that Local 340 was bargaining over subjects that were unlawful. A complaint issued from the NLRB on August 24, 1981, alleging that Local 340 had violated section 8(b)(4)(i)(ii)(A) by engaging in a strike against the contractors represented by NECA with an object of obtaining a "scope of work" clause violative of section 8(e) of the NLRA. The Office of Advice of the General Counsel of the NLRB also concluded that Local 340's

---

**15.** Unless characterized as an assertion or contention, this statement of facts constitutes a finding of undisputed facts within the meaning of Fed.R.Civ.P. 56.

work preservation clause was unlawful and authorized the issuance of a complaint against Local 340 for striking to obtain the clause on July 30, 1981. Subsequently, the Union entered into a settlement agreement with Region 20 of the NLRB not to strike over either of these clauses which the Board had preliminarily determined to be violated of section 8(e).

## IV

### RESOLUTION OF THE MOTION

In the following section, I examine the facts specific to each of the disputed clauses and then resolve the motions as to each clause. Thereafter, I examine plaintiffs' argument that even if each clause was not a cause of the strike or its prolongation, the unions are nevertheless liable because the Union went on strike for an entire package which included the illegal clauses.

### 1. *Picket Line Clause*

Beginning in 1951, every CBA between Local 340 and NECA, including the 1978–81 CBA, contained the picket line clause at issue in this action. The understanding of the parties was that if an opening proposal did not mention a provision contained in the prior agreement, it meant that the party submitting the proposal did not wish to modify or eliminate it but, rather, wanted it carried over verbatim into the new contract. Exhibit B to Defendants' motion, Bunch Decl. at ¶ 4; Exhibit K, Carlson Dep. at 24–25. Neither labor nor management's opening proposals included the picket line clause, Exhibits C and D to Defendants' Motion for Summary Judgment, nor did any of the proposals exchanged by the parties before the commencement of the strike. Exhibit B, Bunch Decl. at ¶¶ 6–7; Exhibit K, Carlson Dep. at 147. Indeed, prior to the strike, NECA's negotiating committee never suggested that it considered the picket line clause illegal. Exhibit B to Defendants' motion, Bunch Decl. at ¶ 7. NECA first concluded that the pick-

et line clause was illegal sometime between June 30 and August 5, 1981. Exhibit J to Defendants' motion, Answer to Interrogatory 8(i). The picket line clause was first mentioned in a negotiating session on August 3 or 4, 1981—seven weeks after the strike had commenced. Exhibit K, Carlson Dep. at 148. Consistent with the facts, the President of NECA, Samuel Myers, concedes that the Union did not go out on strike over this clause. Exhibit L, Myers Dep. at 159.

At the August 4 session, NECA stated that it believed that the clause was illegal. Exhibit K, Carlson Dep. at 150. In response, defendants counterproposed the shoulder-to-shoulder clause. The following day, August 5th, NECA proposed a deletion of all language declared illegal by the NLRB and plaintiffs' assert that the Union understood the proposal to include the picket line clause. Exhibit S to Plaintiffs' motion, Bunch Dep. at 145–46. On August 11, the parties agreed to leave the picket line clause in the agreement and to delete it if it was later proven to be illegal. Plaintiffs' motion at 9; Plaintiffs' opposition at 6. The Union formally withdrew its proposal for new language for this clause by telegram dated September 2. Plaintiffs' motion at 9.

Plaintiffs assert that there was a conversation with the Union, either prior to or after July 27, in which the Union said that they had to have the picket line clause. Plaintiffs' opposition, Exhibit 1, Carlson Dep. at 17. Plaintiffs also support their allegations by providing the deposition testimony of Steven Moore, a NECA contractor and member of the NECA negotiating committee, in which Moore says that he "think[s]" that IBEW International representative, Tom Roberts, "made a couple of comments" to the effect that "they had to have the [picket line] clause," and Lee Frith, Business Manager of Local 340, said that the clause "was the only way they could protect their work." Exhibit 2 to Plaintiffs' opposition, Moore Dep. at 17.

The Union's assertion that the picket line clause was not at issue at the time of the strike is unrefuted by plaintiffs. Indeed, plaintiffs only contend that "the parties' failure to agree on the [picket line] clause ... materially contributed to the continuation of the strike [only] after August 4, 1981." Plaintiffs' opposition at 4. As to this period, we have the following facts proposed by defendants: (1) The picket line clause was first challenged by NECA on August 4, 1981, seven weeks after the strike began, Plaintiffs' motion at 7; (2) Many of the concedely legal issues over which the union had struck on June 11 were still in dispute on August 4, and remained in dispute until the strike ended on September 15, Defendants' motion, Exhibit M, Marana Dep. at 31–32, Exhibit B, Bunch Decl. at 9; (3) If NECA had agreed to the picket line clause, the Union would not have ended the strike, Defendant's motion, Exhibit K, Carlson Dep. at 166, Exhibit L, Myers Dep. at 171; (4) The Union removed the picket line clause from its bargaining proposal on August 11, Plaintiffs' motion at 8; (5) The parties agreed on that same date to keep the picket line clause in the contract and to delete it if it was later proved to be illegal, Defendants' motion, Exhibit K, Carlson Dep. at 170.

The Union thus asserts that the picket line clause was not a substantial factor in the continuation of the strike. The Union relies on the testimony of Kenneth Carlson, Executive Manager of NECA, who stated that had NECA told Local 340 that they could have the clause in their contract, that concession would not have ended the strike. Exhibit K, Carlson Dep. at 166. Thus, taken alone, the Union argues the picket line clause cannot be claimed to be a "substantial factor" which "materially contributed" to the injury caused by the strike within the meaning of Mead.[16]

It is uncontested that the picket line clause was not a cause of the strike. In-deed, since this clause was not in contention until the plaintiffs discovered its purported illegality and so reported to the Union on August 4, its effect as a cause of injury can only be assessed from that date onward. For the reasons explained below, I conclude that the evidence tendered by the Union permits only an inference that this allegedly illegal clause, standing alone, was insufficient to prolong the strike. Because I also determine that the evidence tendered taken together does not provide a factual predicate for the opposite inference, I conclude that no genuine issue remains for trial, and summary judgment as to this clause must be granted.

█ I begin by noting that Kenneth Carlson, Executive Manager of NECA, has admitted that had NECA conceded the picket line clause, the strike would have persisted. Thus, the Union's evidence satisfies the first half of the Mead test, namely, that the strike would have continued because of the Union's legal motives standing alone. There is no direct evidence on the second half of the test—whether the Union would have continued the strike over just the picket line clause. Nonetheless, the fact that the strike occurred despite the clause not being in contention at its initiation, and continued after settlement of the picket line clause, is strongly suggestive that although the clause may be viewed as "a cause" of the prolongation of the strike for the period it was in contention, the clause was not a "major or dominant cause." Moreover, the parties' agreement to include the clause subject to a later legal determination, is highly suggestive that the clause was not a weighty consideration as to either party. I recognize of course that such a resolution is inferential, but it is the only reasonable inference to draw from the facts adduced. See Matsushita Electrical Ind. Co. v. Zenith Radio Corp., —— U.S. ——, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). It is simply inconsistent to suggest that the

---

**16.** Plaintiffs nonetheless contend that the Union is liable for all damages caused by the strike because the Union insisted on a "package deal;" this contention is dealt with infra.

Union would have continenced such a shakey resolution of the issue if indeed it represented a major consideration for the strike. For this reason, the evidence suggests that the reasonable inference to be drawn is that at most the clause represented "a cause in fact" but not a major motivation, a weighty proximate cause, for the prolongation of the strike.

As a matter of summary judgment practice, the Union having produced evidence that the strike occurred and continued without reference to the picket line clause, and that the Union agreed to a resolution of the issue which could result in the clause being eliminated, the burden shifts to plaintiffs to produce evidence that the picket line clause would in itself have prolonged the strike. *Mead* at 1379. The plaintiffs have failed to do so. Although it is true that NECA has presented evidence that a Union official had described the clause as a "must," that conversation occurred when the clause was not in contention and indeed before the strike occurred. Given the plaintiffs' concession that the strike was not occasioned by the clause, except in the "package" sense discussed *infra*, that evidence is simply not relevant to the Union's attitude on August 4, the date the employer first raised the issue. Indeed, given the fact that the Union rather than resisting deletion of the clause, simply proposed substituting the "shoulder-to-shoulder" clause, there simply is no factual predicate to support plaintiffs' contention. In sum, plaintiffs have failed to produce any evidence from which an inference adverse to defendants may be drawn.[17]

Having failed to produce evidence sufficient to demonstrate a "genuine" issue, the defendants' motion as to this clause must be granted unless the "package" issue dictates otherwise. From the evidence produced, the only reasonable inference is that standing alone, the picket line clause was not a weighty consideration in the prolongation of the strike. Plaintiffs have failed to produce any evidence upon which an inference could reasonably be drawn that the picket line clause standing alone would have been sufficient to prolong the strike. Put another way, plaintiffs have not produced a factual predicate sufficient to permit the court to draw an inference on their behalf; accordingly, summary judgment appears appropriate.

### 2. *Shoulder-to-Shoulder Clause*

The shoulder-to-shoulder clause was not proposed until August 4, and then as a replacement for the picket line clause. Plaintiffs' motion at 8. It was withdrawn on August 11. Exhibit K, Carlson Dep. at 170. The clause was reintroduced on August 31. Carlson Dep. at 172. The clause was withdrawn by telegram on September 2 and never reintroduced. Plaintiffs' motion at 9. During the period that the shoulder-to-shoulder clause was on the table, many other concededly legal issues that led to the strike remained unresolved. Exhibit B, Bunch Decl. at ¶ 12. Bunch has testified that while the shoulder-to-shoulder clause was on the table, "all of the major issues over which the Union had initially struck were still in dispute." *Id.* Additionally, Peter Marana, a member of NECA's negotiating committee, has stated that the number of items in dispute remained large, as high as a dozen, throughout the strike. Defendants' motion, Exhibit M, Marana Dep. at 64–65. NECA's President, Samuel Myers, has testified that if NECA had said to the Union that they could have the shoulder-to-shoulder clause, the strike would have continued. Defendants' motion, Exhibit L, Myers Dep. at 170–71. In fact, the strike did continue after the shoulder-to-shoulder clause was withdrawn on

---

17. "'An inference ... is a deduction of one fact from another, proven fact by the ordinary rules of logic and reason.' [Citations omitted.] Thus, to draw an inference two conditions must exist; first, a proven fact, second, a logical deduction from that fact, drawn pursuant to ordinary rules of logic and reason." *Richards v. Nielsen Freight Lines,* 602 F.Supp. 1224, 1244 (E.D.Cal. 1985).

September 2. Defendants' motion, Exhibit A, Request for Admission No. 19; Exhibit B, Bunch Decl. at ¶ 12.

■ As noted above, the shoulder-to-shoulder clause was first proposed on August 4, and withdrawn on August 11, only to be reintroduced on August 31, and withdrawn again on September 2. Thus, the pertinence of the clause covers only those periods. The strike occurred before the clause was in issue, was withdrawn as a proposal by the Union, and the strike continued after withdrawal of the clause. Under the *Mead* test, as analyzed above in connection with the picket line clause, it does not appear to have been a substantial cause of any injury plaintiffs sustained by virtue of the strike. If anything, NECA was only "negligibly affected by [the alleged] violation." *Mead* at 1379.

### 3. *Work Preservation Clause*

■ Local 340 proposed a work preservation clause which had not been part of the parties' previous bargaining agreement at the first negotiating session. Plaintiffs' motion at 9. Its purpose was to deal with the problem of contractors who ran both union and non-union operations, so-called "double-breasting." Defendants' motion at 18–19. It was introduced at the first formal negotiating session on April 22. The work preservation clause was discussed at the April 28 and May 9 meetings. Plaintiffs' motion at 11. NECA rejected the clause on May 27. *Id.* The Union proposed it again on June 3. *Id.* On June 10, management counter-proposed a portion of the work preservation clause in the form of the standard language recommended by the International Office of the IBEW as one of eight concession items. *Id.* This is the clause at issue in the fourth cause of action. The Union informed NECA by counter-proposal on June 10, that the work preservation clause as proposed by NECA would be acceptable. Defendants' motion, Exhibit B, Bunch Decl. at ¶ 13; Exhibit A, Request for Admission No. 6. NECA,

however, rejected the Union's package. Plaintiffs' motion at 12. Plaintiffs argue that despite the fact that the work preservation clause was contained in both parties' proposals of June 10 and June 17, there was never an agreement on the clause because the Union required assent to each and every item, which never occurred. Plaintiffs' Opposition at 12. In essence, except for the issues tendered by the "package" argument, this clause could not have been a cause of the strike which commenced on June 11, or its prolongation, since it was accepted by both sides on June 10.

### 4. *The Package Requirement*

I have noted above that defendants have met their initial burden of demonstrating that the purportedly illegal clauses were not substantial causes in bringing the strike about. Thus, the burden shifts to plaintiffs to demonstrate a genuine issue of material fact concerning the effect of the clauses on the strike's progress. They seek to do so by virtue of the "package argument."

■ Plaintiffs contend that resolution of the motivational issue on a clause-by-clause basis is inappropriate. This contention is premised on plaintiffs' "whole package" theory, i.e., that the Union bargained for a complete set of demands, no one of which could have been deleted so as to end the strike. Plaintiffs cite the deposition testimony of Michael Dyba, a member of the Union's negotiating committee, that the Union went on strike for everything contained in the Interim Agreement and everything unchanged in the old agreement. Plaintiffs' Opposition, Exhibit 3, Dyba Dep. at 43–44; Exhibit 4, Bunch Dep. at 201.

It is important to note what the plaintiffs do not say. They do not claim that the only ingredients to settlement during the post-August 4 period were the allegedly illegal clauses, nor do they argue that there were no legal clauses at issue during this

period over which the Union could not legitimately strike. They only argue that the Union sought a "package" of demands, some of which are alleged to be illegal. As I explain below, the plaintiffs' argument amounts to no more than a demonstration that by virtue of the package posture of the Union, each clause, including the purported illegal clauses, was "a cause in fact" of the strike; such proof, however, does not address the weight of the illegal clauses as a factor in either causing or prolonging the strike.

Plaintiffs assert that "the negotiations in this case would have required the employer association and plaintiffs to convert to *each* and *every* of the Union's proposals, *including* those alleged as illegal in this action, in order for a new agreement to be consummated." Plaintiffs' Opposition at 7 (emphasis in original). Plaintiffs also argue that their assent to all items but those alleged as illegal would have resulted in a prolongation of the strike, but this assertion is unsupported by evidence and is rebutted by the statements of NECA's President, Sam Myers, Exhibit L, Myers Dep. at 171, and Executive Manager Kenneth Carlson, Exhibit K, Carlson Dep. at 166, noted above. In effect, the plaintiffs have simply produced no evidence concerning the second prong of the *Mead* test. The plaintiffs argue that the strike would have continued on the basis of the purported illegal clauses, but they have not produced evidence to support their argument. It is of course true that there is evidence that the Union struck for each and every clause. That does not answer the *Mead* question as to whether the illegal clauses standing alone would have caused or prolonged the strike. The Union has demonstrated that the legal clauses standing alone would produce the strike, and have provided a factual premise for the inference that the clauses in contention standing alone were not weighty causes of the strike. Under summary judgment practice, the burden shifts to

plaintiffs—as opposing party—to demonstrate that a genuine issue of fact exists, either by producing direct evidence to the contrary, or at least a factual predicate for an adverse inference. Plaintiffs have produced no such evidence.

Under the circumstances, the court finds that although there is "metaphysical" doubt, "a rational trier of fact" could not "find for the nonmoving party," from the evidence adduced in connection with the motion. *Matsushita Elec. Ind. Co. v. Zenith Radio,* —— U.S. ——, 106 S.Ct. at 1355 (1986). Put another way, although the court must draw all reasonable inferences in favor of the opposing party, that party must produce facts from which such an inference may reasonably be drawn. *Richards v. Nielsen Freight Lines,* 602 F.Supp. 1224, 1244–45 (E.D.Cal.1985).

For all the above reasons, defendants' motion for summary judgment as to the second and fourth causes of action is GRANTED.

I am of the opinion that this order involves a controlling question of law as to which there is substantial ground for differences of opinion, and an immediate appeal from the order may materially advance the ultimate termination of the litigation. *See* 28 U.S.C. § 1292(b).

Accordingly, an interlocutory appeal may be taken from this order pursuant to 28 U.S.C. § 1292. All proceedings are stayed pending appeal, if any. The status conference previously scheduled for June 30, 1986, is VACATED.

The parties are directed to inform the court within ten (10) days of the effective date of the order of the court of appeals' disposition as to whether it will allow interlocutory appeal.[18]

IT IS SO ORDERED.

---

18. The issue of whether IBEW International was an agent of Local 340 and is legally liable for conduct engaged in by Local 340 in further-

ance of the strike is not addressed in this order. After disposition of the appeal, if any, plaintiffs are directed, within thirty (30) days of the effec-

tive date of this order to re-notice their motion on this issue on this court's regularly scheduled law and motion calendar. Said notice shall be accompanied by a letter brief summarizing plaintiffs' arguments and bringing to the court's attention any new cases. Defendants shall file their opposition by letter brief also summarizing their arguments on this issue and bringing to the court's attention any new cases fourteen (14) days prior to hearing.