NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

IRONWORKERS LOCAL 433, Affiliated with the International Association of Bridge, Structural & Ornamental Workers, AFL–CIO, Respondent.

No. 87–7051.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 10, 1987.

Decided June 27, 1988.

---

John D. Burgoyne, N.L.R.B., Washington, D.C., for petitioner.

David A. Rosenfeld, Van Bourg, Weinberg, Roger & Rosenfeld, San Francisco, Cal., for respondent.

Before BROWNING, HUG, and REINHARDT, Circuit Judges.

REINHARDT, Circuit Judge:

The National Labor Relations Board petitions for enforcement of a broad remedial order against Ironworkers Local 433. The Board found that Local 433 had violated the secondary boycott provisions of the National Labor Relations Act on four separate occasions. Local 433 contests the order and the Board's decision on two of the four violations. We deny enforcement of the order and remand the case for further proceedings.

### I.

The two incidents regarding which Local 433 challenges the Board's findings occurred at the Carlson jobsite and the Circus Circus jobsite. In both cases, the facts are not in dispute.

In November 1984 Southland Corporation retained Carlson Southwest Corp. as the general contractor for the construction of a large warehouse facility and a vehicle maintenance facility in San Bernardino, California. The installation of metal racks in the warehouse was subcontracted to Warehouse Equipment, Inc., a non-union company.

A business agent for Local 433 inquired as to the name of the company installing the racks and was told it was Warehouse. Warehouse did not have a contract with the union. After hearing rumors that Local 433 was upset because the installation work was being done by a non-union company, Carlson sent Local 433 a telegram. The telegram stated that Carlson would set up a reserve gate system at the jobsite,

with Warehouse being assigned to gate number 1. However, when the pickets arrived at gate number 1, they found a sign stating that certain specified employers were assigned to use that gate, while all other employers were directed to use gate number 2. Warehouse was not one of the specified employers. Two picketers then picketed both gates at the jobsite for two days. Their signs stated:

Work Being Performed
Below StandardsEstablished By
Iron Workers Local 433
Authorized By
San Bernardino Bldg. & Construction
Trades Council AFL–CIO

Two other subcontractors on the site employed ironworkers. Their ironworkers refused to work on the days the project was picketed.

The Board found that Local 433 had violated the secondary boycott provisions. It based its conclusion that the union's picketing had a secondary objective on the fact that the union picketed gate number 1, a gate the Board held to have been reserved for neutral contractors, and the fact that the union used picket signs that did not name Warehouse as the employer with whom it had a dispute.

## II.

In mid-March 1984, the Answorth–Faulkner Construction Company subcontracted to Vegas Steel the job of performing steel fabrication and erection at the Circus Circus Hotel in Las Vegas, Nevada. Vegas, in turn, subcontracted the work, in its entirety, to United Steel, a non-union company. Local 433 had a longstanding dispute with United.

Fred Toomey, a business agent of Local 433 called Vegas' general manager, Blaise Fossum. Toomey had known Fossum for approximately ten years and they had spoken periodically on the phone. The administrative law judge found that the following was said in this conversation:

Toomey asked who Vegas hired to put up the steel on the Circus Circus project.

Toomey also stated he had heard that Vegas hired a scab outfit to do the work. Fossum replied that Vegas was going to have United perform the steelwork. Toomey then called Fossum an "asshole" and asked if Fossum knew his laws. He [Toomey] stated that Respondent Union had $75 million to fight if it [Vegas] used United. Toomey concluded this conversation with Fossum by saying, "I'll picket the job and see that Pat [Pat Puckett, president of United] doesn't put up a piece of steel."

The administrative law judge added:

On cross-examination, Fossum testified that the steel erection was the entire job and he understood Toomey to mean he would picket Puckett at the Circus Circus job.

The Board found that Local 433 had violated the secondary boycott provisions by threatening Vegas that it would picket Vegas' jobsite, in order to force it to cease doing business with United.

## III.

Section 8(b)(4) of the National Labor Relations Act declared the secondary boycott to be an unfair labor practice. As amended, the section now reads:

(b) It shall be an unfair labor practice for a labor organization or its agents—

.     .     .     .     .

(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

.     .     .     .     .

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business

with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing

29 U.S.C.A. § 158(b)(4) (1973). A union cannot use, or threaten to use, economic pressure against an employer with whom the union does not have a dispute for the purpose of getting the "secondary" employer to stop doing business with the "primary" employer—the employer with whom the union does have a dispute. A union may, however, picket the primary employer at a situs under the control of the secondary employer, as long as the picketing is primary in nature.

*Sailors' Union of the Pacific (Moore Dry Dock),* 92 NLRB 547, 549 (1950), established four criteria to be considered in determining whether picketing at a common situs is primary or secondary[1]:

(a) The picketing is strictly limited to times when the situs of the dispute is located on the secondary employer's premises;

(b) At the time of the picketing the primary employer is engaged in its normal business at the situs;

(c) The picketing is limited to places reasonably close to the location of the situs; and

(d) The picketing discloses clearly that the dispute is with the primary employer.

One of the methods by which secondary employers may lawfully attempt to limit the effect of primary picketing is to establish a separate or reserved gate for use by employees of the primary employer.[2] We have earlier discussed the relationship between the *Moore Dry Dock* standards, the reserved gate system, and proof of a secondary picketing violation:

The reserve gate system at construction sites is an attempt to make concrete the application of the standards devised by the National Labor Relations Board in *Moore Dry Dock.* The reserve gate arrangement, and its manner of use, are, as we have said, not substantive rules of law, but evidentiary. Conformity with the arrangement, or lack of it, are "evidentiary tool[s]," not per se compliance or non-compliance with the law.

Literal compliance (or failure to comply) with the *Moore Dry Dock* standards does not preclude (or establish) a § 8(b)(4) violation or associated § 303 liability if the district court determines that the totality of the circumstances demonstrate impermissible secondary intent (or lack of it). Constar, as the complaining party, had the burden of proving the Union's unlawful intent.

*Constar, Inc. v. Plumbers Local 447,* 748 F.2d 520, 522 (9th Cir.1984) (citations omitted). Thus, notwithstanding a violation of the *Moore Dry Dock* standards or a failure to respect the reserved gate system, the ultimate question which must be answered is whether the General Counsel has carried his burden of establishing an unlawful purpose on the part of the union.

## IV.

In the Carlson matter, Local 433 had been informed by telegram that gate number 1 was reserved for Warehouse, the

---

1. "When a secondary employer is harboring the *situs* of a dispute between a union and a primary employer, the right of neither the union to picket nor of the secondary employer to be free from picketing can be absolute. The enmeshing of premises and *situs* qualifies both rights." *Moore Dry Dock,* 92 NLRB at 549 (footnote omitted).

2. "Even when picketing by employees engaged in a primary dispute take place at property owned by a 'neutral' company, and there is no ally relationship, the picketing may still be treated as lawful if primary employees are working at the site." R. Gorman, *Labor Law* 251 (1976). Therefore, neutral employers will sometimes cut a separate gate, a "reserved gate", for use exclusively by the employers involved in the labor dispute. In that situation, picketing at any location other than the reserved gate will be considered to have illegal secondary effects. *See id.* at 254–57.

employer with whom the union had a grievance. When the pickets arrived at gate 1, they found that a sign had been posted containing different information: that gate 1 would be used for several other specified employers, and that "all others [presumably including Warehouse] must use Gate No. 2". The Board's claim of illegal secondary activity is based on the union's picketing at gate 1.

■ The union was advised in writing by the employer that gate 1 was the appropriate gate for picketing. As far as the record reveals, the union was never directly told otherwise, and the employer's message was never withdrawn; there were no direct communications from the employer to the union concerning reserved gates during the two days of picketing; and notwithstanding the union's supposedly unlawful conduct at gate 1, the employer failed to advise it that the information contained in the telegram was wrong or that it believed the union's picketing at that gate to be unlawful. The *only* evidence that gate 1 was not the appropriate gate for the union's picketing was a sign posted at the gate. Standing alone, that sign cannot overcome the specific written advice to the contrary provided to the union by the employer; thus, the sign does not provide a sufficient factual basis for the Board's conclusion that Local 433 failed to honor a "properly established" reserved gate system. *See NLRB v. Yuba Natural Resources*, 824 F.2d 706, 708 (9th Cir.1987).

What is at issue is a finding that respondents violated federal law. This is a serious conclusion, one we do not lightly reach. The union was entitled to rely on the specific written advice given by the employer. The union cannot be said to have violated the law simply because it did what it was permitted to do under the terms of the employer's written notice. The general sign at the gate was directed to the parties desiring to enter. That general notice was insufficient to overcome the specific written notice directed to the union. To put it another way, more would be needed than the slim evidence the Board has offered before we could uphold its determination

that, by picketing at the gate the employer told it to picket at, the union violated the National Labor Relations Act. Accordingly, we conclude that there is insufficient evidence in the record to support the Board's finding that the union engaged in unlawful picketing at gate 1.

The administrative law judge's report, which was adopted by the Board, concluded from the combination of findings regarding the failure to honor the "properly established" reserved gate and the failure to identify the primary employer on the picketing signs that there was a presumption that Local 433's picketing had an illegal secondary objective. The administrative law judge then concluded that the union had not presented sufficient evidence to overcome that presumption. We now reverse one of the two findings that support the administrative law judge's (and thus the Board's) holding that the union violated the Act. Whether the one remaining instance of noncompliance with the *Moore Dry Dock* criteria, the absence of identifying wording on the picket signs, is by itself sufficient to justify a finding that the union had an illegal secondary objective is a question we leave for the Board's initial consideration on remand. *Cf. Constar*, 748 F.2d at 523.

### V.

■ In the Circus Circus matter, Local 433 told a neutral (secondary) employer that was planning to use a non-union contractor that it would picket the job and ensure that the non-union contractor (the primary employer) would be unable to do its work. Section 8(b)(4) forbids secondary picketing and the threat of secondary picketing. It does not reach informing secondary employers of, or "threatening" them with, picketing of primary employers, including primary employers scheduled to work at a common situs. *See* 29 U.S.C. § 158(B)(4).

The administrative law judge's opinion, adopted by the Board, does not assert that Local 433 threatened to picket an employer other than the employer with whom the union had a grievance. Rather, the admin-

istrative law judge bases his conclusion that Local 433 violated Section 8(b)(4) on the following:

> [I]t would appear that more recent Board decisions require that a union, when expressing threats to a secondary to picket a primary at the premises of a secondary, to [sic] qualify the threat by clearly indicating that the picketing will conform with the lawful restrictions imposed on such picketing.

The Board argues that since Local 433 did not affirmatively assure the secondary employer that picketing would be conducted within the *Moore Dry Dock* limitations, Local 433's statements must be interpreted as a threat to commit illegal secondary actions.

The administrative law judge felt bound by earlier Board decisions, *Butchers Union Local No. 506*, 268 NLRB 475, 478 (1983); *Sheet Metal Workers Local No. 418*, 227 NLRB 300, 312 (1976), to hold that unqualified threats to picket a primary employer at a secondary employer's situs are conclusively presumed to have an unlawful secondary objective. The Board, adopting the administrative law judge's conclusions, would treat every union threat to picket at a common situs as an illegal secondary threat under section 8(b)(4) unless the union "give[s] advance assurances that its picketing will comply with lawful restrictions on common situs picketing." However, the Board cites no statutory basis and no circuit court opinions supporting its adoption of the *per se* conclusive presumption.[3] Nor does the Board in the present case, or in any of the previous cases listed, offer any reasons grounded in the purposes of the National Labor Relations Act justifying the use of so extreme an evidentiary standard.[4]

First, we note that the union's threat was a specific and limited one. We would be less sympathetic had Local 433 told Vegas "we will picket you", and then claimed that it was referring only to an intention to picket United. Here, however, Local 433 specifically threatened to picket "the job". It is apparent from the context of the entire conversation that "the job" referred to the steel erection work to be done by United and that a reasonable employer would have so understood the reference. In fact, the secondary employer, according to the testimony of its general manager, did understand that the union was threatening to picket United. Equally important, Local 433 expressly advised Vegas of precisely what it intended to accomplish by the picketing: to prevent United from putting up any steel.

Second, the Board's requirement that union representatives parrot particular words or phrases, or announce an intention to comply with particular legal formulae, when talking with management representatives is troublesome given the informal, non-legalized reality of day-to-day labor relations. It is a long-established tenet of labor law that dealings between union and management should not be held to the rigid formalistic rules that are appropriate to other areas of law. *See, e.g.,* Cox, "Reflections Upon Labor Arbitration", 72 *Harv.L. Rev.* 1482 (1959). The parties involved are sophisticated in labor matters, but they do not communicate in the carefully prepared, carefully couched legal formulae of law-

---

3. The only published circuit court opinion that the Board cites, *Bryant Air Conditioning and Heating v. Sheet Metal Workers' International Assoc., Local 541*, 472 F.2d 969 (8th Cir.1973), is not on point. Though the union's threat to picket in that case is referred to in passing as an "unqualified threat", *id.* at 972, the court earlier specifically found that "[t]he record contains substantial evidence justifying the trial court's ultimate finding that the language and conduct of the union's representatives ... effectively conveyed the message that ... the union would engage in general picketing." *Id.* The Board does not offer similar supporting findings in the present case.

4. The Board argues in passing that any objection to its application of its evidentiary standard was waived because it was not brought before the Board, 29 U.S.C. § 160(e). We disagree. We find that Local 433's objection to the application of the Board's evidentiary standard was not " 'so ambiguous as to be totally ineffective to adequately apprise the Board' that the issue is disputed," and therefore the objection is properly before us. *Local 512, Warehouse & Office Workers' Union v. NLRB*, 795 F.2d 705, 714 (9th Cir.1986) (quoting *NLRB v. Giustina Brothers Lumber Co.*, 253 F.2d 371, 374 (9th Cir.1958)).

yers, and it is unrealistic to expect them to do so. In the present case, Local 433's business agent called Vegas' general manager. The two men had known one another for approximately ten years and had spoken periodically by phone, and had no difficulty in understanding each other.[5] Little would have been gained had the union's agent invoked *Moore Dry Dock* during the conversation.[6]

Third, as we stated earlier, we will not lightly find that a federal law has been violated; the mere failure of a union agent to invoke a particular incantation or to announce that picketing will be conducted in a lawful manner is, without more, not sufficient to meet the Board's burden of proof. The primary question is not whether particular words were used, or a disclaimer issued, but how, given the context of the conversation, the union's statements should reasonably be understood. In the present case, the Board does not question the admission by Vegas' general manager that he understood Local 433 to be threatening to picket the primary employer, nor did it, in its decision, deny that such was the reasonable interpretation of the union's remarks. Equally important, there is no evidence in the record that the union threatened to engage in any unlawful picketing or that its threat to picket would reasonably be so understood.

Fourth, we find that there is still considerable merit to the general legal principle that people should be presumed to be acting lawfully until proven otherwise. Certainly, we are aware of no legal principle that would warrant an opposite presumption in the absence of some indication that the conduct in question was in fact unlawful.

In his decision, which the Board adopted, the administrative law judge said that whenever a union tells a secondary employer that it will picket a primary employer at a common situs, the union must add that it will comply with the legal standards applicable to such picketing (i.e., the *Moore Dry Dock* criteria). We see no justification for requiring this additional statement in the absence of evidence that the union intends to picket in an unlawful manner or that its conduct or statements would reasonably be so understood.

■ In effect, the Board has said that any threat to picket a primary employer at a common situs will be conclusively presumed to have an unlawful purpose unless the union proclaims that its picketing will be conducted in a lawful manner. As this *per se* presumption is without foundation in the NLRA and in our cases, and as it is contrary to general legal principles, we conclude that its application to the present case is irrational and beyond the Board's authority.[7] Therefore, we decline to apply it.[8] *Cf. NLRB v. Financial Institution*

5. According to the administrative law judge, "Fossum testified that the steel erection was the entire job and he understood Toomey to mean he would picket [United] at the Circus Circus job."

6. It is not clear what statements the Board thinks would be sufficient for a union to prove its lawful intentions. At one point in its brief, the Board faults Local 433 for not assuring Vegas that its picketing "would conform with *Moore Dry Dock.*" Yet, at another point in its brief, the Board points out, citing *Sherman Oaks Med. Arts Ctr. v. Carpenters Local 1936,* 680 F.2d 594, 597 (9th Cir.1982), that compliance with *Moore Dry Dock* is not necessarily sufficient to preclude a finding that picketing was illegal.

7. We need not here consider under what circumstances a union's statements and conduct regarding common situs picketing might reason-

ably be understood by an employer as a threat to engage in unlawful activity, and thus warrant requiring a disclaimer; nor do we consider whether such a disclaimer can be in a general form or must include a specific reference to the *Moore Dry Dock* criteria.

8. In view of the above, we need not consider Local 433's argument that the Board failed to demonstrate that there would have been other employers at the Vegas/United jobsite, i.e., that the jobsite would have been a common situs where the *Moore Dry Dock* criteria would have applied. Local 433 argues that in the absence of evidence that the jobsite would be a common situs, a union has no obligation to assure management that it will abide by the *Moore Dry Dock* criteria. The Board argues that when threats to picket involve construction sites, we should presume that the jobsite would be a common situs. We express no judgment regarding the validity of either party's arguments.

*Employees,* 475 U.S. 192, 106 S.Ct. 1007, 1013, 89 L.Ed.2d 151 (1986) (rejecting rule promulgated by the Board because rule exceeded Board's authority under NLRA). Without the application of the *per se* evidentiary standard, the Board's finding of a violation in the Circus Circus matter is not supported by substantial evidence in the record. Accordingly, we reverse that finding. *Yuba Natural Resources,* 824 F.2d at 708.

## VI.

For the reasons given above, we reverse the findings that Local 433 violated the National Labor Relations Act on one of the four violations found by the Board and remand on a second one. We cannot assume that the Board would issue the same order given that we have vacated two of its findings of violations. We therefore decline to enforce the Board's broad remedial order. We remand the case to the Board so that it may reconsider its finding on the Carlson jobsite allegation and then determine what remedial order is appropriate.

ENFORCEMENT DENIED AND RE-MANDED